UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
IMMACULATA TEGETE,

Plaintiff,

-against-

MARYKNOLL SISTERS OF SAINT DOMINIC, INC., MARYKNOLL COMMUNITIES, INC.

Defendants.
---------------------------------------------------------------x

7:20-cv-05023 (CS)

**STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

Defendant, Maryknoll Sisters of St. Dominic Inc. ("Maryknoll" or "Defendant"), by its attorney, Richard A. Coppola, hereby submits this Statement of Material Facts Pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, to set forth material facts as to which it contends there are no genuine issues to be tried:

1. Plaintiff Immaculata Tegete ("Plaintiff") was raised in a Roman Catholic family in Mbinga, Tanzania. *See* Exhibit A to Affirmation of Richard A. Coppola dated January 28, 2022 ("Coppola Aff.") ¶ 14 and Exhibit C to Coppola Aff. at 11:18-25, 12:1-7.

2. Plaintiff attended Mass with her parents every Sunday. *See* Exhibit C to Coppola Aff. at 16:16-25, 17:1-3.

3. One of Plaintiff's uncles was a priest for the Diocese of Dar Es Salaam, and another was a missionary priest. *See* Exhibit A to Coppola Aff. ¶ 15 and Exhibit C to Coppola Aff. at 25:14-25 and 26:1-10.

4. Plaintiff was college educated and also took courses in accounting and administration while in Tanzania. *See* Exhibit C to Coppola Aff. at 33:3-25 and 34:1-3.

5. Before encountering Maryknoll, Plaintiff already knew what being part of a

religious order entailed, and specifically that she could freely leave a religious order. She previously had done so. *See* Exhibit C to Coppola Aff. at 40-43).

6. In or about 1996, Plaintiff joined the Benedictine Sisters of Peramiho, Tanzania (the "Benedictine Sisters"), whose mission was to serve locally by teaching Catholic catechism, religious studies, and the Bible. *See* Exhibit C to Coppola Aff. at 39:13-14 and 42:12-19.

7. Plaintiff joined this religious order as a Postulant. *See* Exhibit C to Coppola Aff. at 40:22-25 and 41:1-5.

8. The Benedictine Sisters paid for Plaintiff to attend and study theology at Theological College in Mgazini, Tanzania. *See* Exhibit C to Coppola Aff. at 33:1-7, 227:18-24, and 288:1-9).

9. Plaintiff left the Benedictine Sisters around 2000 (also a four-year term) because that religious order did not offer her the international mission experience she desired. *See* Exhibit C to Coppola Aff. at 37:6-9, 41-43.

10. Immediately thereafter, Plaintiff visited Bishop Emanuel Mapunda who hired her as an administrator of a hospital in Litembo. *See* Exhibit A to Coppola Aff. ¶ 23 and Exhibit C to Coppola Aff. at 47-48:1-18.

11. Plaintiff later worked as a secretary and an accounting clerk for Bishop Mapunda in Mbinga. *See* Exhibit A to Coppola Aff. ¶ 23 and Exhibit C to Coppola Aff. at 52:1-8.

12. In September 2007, after seeing a reference to Maryknoll in a Catholic directory in Tanzania, Plaintiff initiated contact, writing a letter to Maryknoll in Dar Es Salaam, Tanzania. *See* Exhibit C to Coppola Aff. at 74:8-25 and 75:1-24 and Exhibit J to the Declaration of Sr. Janet Srebalus, MM, executed on January 27, 2022 ("Srebalus Dec.").

13. In the letter, Plaintiff inquired about Maryknoll since she was "trying to find out

which mission religious order [she would] be inspired to join." *See* Exhibit C to Coppola Aff. at 73:25, 74:1-3, 75-76 and Exhibit J to Srebalus Dec.

14. Between September 2007 and June 2008, Plaintiff corresponded with Sr. Maureen Meyer who answered her questions and sent her Maryknoll Magazines and other information on Maryknoll. *See* Exhibit F to Coppola Aff. at 12:22-25; Srebalus Dec. ¶ 3 and Exhibit J. thereto.

15. In June 2008, Plaintiff met Sr. Janet Srebalus, a member of the Admissions Team for Maryknoll in Tanzania, at the Tanzania Episcopal Conference Hostel. *See* Exhibit F to Coppola Aff. at 12:15-21 and Srebalus Dec. ¶ 4.

16. Thereafter, Sr. Srebalus was Plaintiff's vocation contact person until 2010 when Plaintiff was accepted by the Congregational Leadership Team ("Leadership") for entrance in the two-year Candidacy Program. *See* Exhibit F to Coppola Aff. at 13:4-9; Srebalus Dec. ¶ 5 and Exhibit J thereto.

17. Plaintiff then took the following voluntary steps for admission to Maryknoll: (1) wrote a formal letter of application, (2) drafted an autobiography, (3) completed a personal profile form, (4) was interviewed, and (5) participated in her "Live-In" in a Maryknoll community house in Kalebejo, Tanzania (with Sr. Peg M. Donovan) so that she could experience life with Maryknoll. *See* Exhibit F to Coppola Aff. at 18-19 and 21:5-10; Exhibits J and K to Srebalus Dec.

18. As a part of the pre-candidacy stage, a woman is to participate in an at least four month live-in with one of Maryknoll communities and enters into their life mission as fully as possible. *See* Srebalus Dec. ¶ 6.

19. In December 2009, Maryknoll accepted Plaintiff's application to become a novice. *See* Exhibit C to Coppola Aff. at 141:1-13.

20. Thereafter, Maryknoll assisted Plaintiff with obtaining a Religious Worker (R-1) Visa from the United States Citizenship and Immigration Services ("USCIS"). *See* Exhibit L to Coppola Aff.

21. As part of that process, Maryknoll verified that they would be responsible for Plaintiff's needs while she resided in the United States. *See* Exhibit M to Coppola Aff.

22. In mid-2010, Plaintiff's R-1 Visa was approved. *See* Exhibit A to Coppola Aff. ¶ 53.

23. On July 5, 2010, Plaintiff, who was then 37 years old, flew from Tanzania to New York. *See* Exhibits K and N to Coppola Aff.

24. Plaintiff was not forced to come to America. She came of her own free will. *See* Exhibit C to Coppola Aff. at 160:4-14.

25. Plaintiff was legally in the United States at all times while she was associated with Maryknoll. *See* Exhibit C to Coppola Aff. at 496:21-25 and 497:1-4.

26. For the months of July and August 2010, Plaintiff resided at Maryknoll Center in Ossining, New York. *See* Declaration of Sr. Janet Hockman, MM, executed on January 27, 2022 ("Hockman Dec.") ¶ 2.

27. There, she acclimated herself with religious life specific to the Congregation and became acquainted with Maryknoll. *See* Hockman Dec. ¶ 3.

28. Between early July and late August 2010, Plaintiff attended Mass, took English lessons, participated in vocational gatherings, and had ministry time. *See* Exhibit C to Coppola Aff. at 193:14-16 and Exhibit O to Coppola Aff.

29. Shortly after arriving in the United States, Sr. Janet Hockman, Director of the Admissions (Vocations) Department for Maryknoll from 2009 through 2014, accompanied

Plaintiff to obtain a social security card in Peekskill, New York. *See* Hockman Dec. ¶ 4 and Exhibit C to Coppola Aff. at 206:1-9.

30. Plaintiff needed her passport to obtain her social security card. *See* Hockman Dec. ¶ 5 and Exhibit C to Coppola Aff. at 204:21-25 and 205:1-5.

31. On July 20, 2010, Plaintiff was issued a social security number and card, which she needed to register for school and enroll in classes at Catholic Theological Union in Chicago. *See* Exhibit C to Coppola Aff. at 205:6-25; Hockman Dec. ¶ 6 and Exhibit P thereto.

32. Plaintiff's original passport (with her visa inside the passport) was taken to a secure office at the Maryknoll residence known as the Secretariat office for safekeeping. *See* Hockman Dec. ¶ 7.

33. All important documents of Maryknoll are safeguarded in the Congregation's Secretariat office. *See* Hockman Dec. ¶ 8.

34. There was no lock on Plaintiff's bedroom or secure place to keep her personal documents in her bedroom. *See* Exhibit C to Coppola Aff. at 208-210.

35. Plaintiff never asked any of the Maryknoll Sisters where her passport was stored. *See* Exhibit C to Coppola Aff. at 213:1-6.

36. Plaintiff knew Sr. Hockman was keeping her passport and "trusted" that Sr. Hockman would "give [it to her] when she's ready to give [to her]." *See* Exhibit C to Coppola Aff. at 204:11-13, 213:12-14, and 280:3-13.

37. Plaintiff did not tell any of the Maryknoll Sisters, at any time, that she preferred to keep her passport in her possession. *See* Exhibit C to Coppola Aff. at 213:18-21.

38. Plaintiff could have access to her passport whenever she desired it. *See* Hockman Dec. ¶ 9.

39. Plaintiff was given her passport every time she requested it. *See* Hockman Dec. ¶ 10 and Exhibit Q to Coppola Aff.

40. Plaintiff's other personal documents stayed in her possession while she was at Maryknoll. *See* Exhibit C to Coppola Aff. at 212:20-25.

41. On August 8, 2010, Maryknoll formally accepted Plaintiff as a novice candidate. *See* Exhibit R to Coppola Aff.

42. In the fall of 2010, Plaintiff, along with one other Maryknoll novice, went to live in Chicago at Maryknoll's Orientation House. *See* Declaration of Sr. Theresa Kastner, MM, executed January 27, 2022 ("Kastner Dec.") ¶ 2.

43. There, Plaintiff and the other novice began their formal orientation to live as a Maryknoll Sister. *See* Kastner Dec. ¶ 3.

44. Sr. Theresa Kastner and Sr. Shu Chen Wu, co-directors of Maryknoll's orientation program (the "Orientation Program"), returned Plaintiff's passport to her before she traveled to Chicago. *See* Exhibit C to Coppola Aff. at 280:12-22.

45. During a two-year period known as the Integration or Formation Period, a novice discerns whether Maryknoll's form of religious life "fits" with her expectations. *See* Kastner Dec. ¶ 4.

46. During the Formation Period, novices study Maryknoll documents, live in community life, pray together, further study theology and scripture, and do some mission work. *See* Exhibit F to Coppola Aff. at 29:23-25 and 30.

47. Plaintiff was aware of these tasks before she left Tanzania, but now complains that there was not enough time for personal prayer and communal prayer during the Integration Phase. *See* Exhibit C to Coppola Aff. at 185:17-25 and 186:1-23.

48. Plaintiff participated in the Orientation Program. *See* Kastner Dec. ¶ 5.

49. Orientation included: (1) auditing theological studies at Catholic Theological Union in Chicago, including a once weekly, all day, Inter-Congregational Program of Theological/Spiritual/Psychological lectures (together with other men and women in their Congregations' Formation Programs); (2) participating in a weekly day of prayer and study of Maryknoll History and Constitutions; (3) working at an outreach ministry for the poor; and (4) participating in the daily life of the Maryknoll Sisters' community. *See* Kastner Dec. ¶ 5 and Exhibit S thereto.

50. Plaintiff, along with other novices and Maryknoll Sisters, worked as a volunteer in a soup kitchen, which provided food to the homeless, and she did clerical work at a local parish. *See* Kastner Dec. ¶ 6.

51. Plaintiff also worked at the University of Chicago Medical Center in the Chaplain Department, distributing Holy Communion to the sick and visiting and saying prayers with them. *See* Kastner Dec. ¶ 7.

52. On July 1, 2011, Plaintiff signed: (1) a Memorandum of Understanding Regarding Maryknoll Sisters Sponsorship for a Nonimmigrant Religious Visa ("Memorandum of Understanding"); and (2) an Agreement Regarding Compensation for Services Rendered ("Agreement Regarding Compensation"). *See* Hockman Dec. ¶ 11 and Exhibits T and U thereto.

53. In the Memorandum of Understanding, a document that all Maryknoll candidates from outside the United States execute during the Formation Phase, Plaintiff agreed that: (1) as a candidate of Maryknoll she would conform to all of its rules as stated in the Constitutions; (2) as a non-United States citizen, she understood that she was in the United States under the sponsorship of Maryknoll; (3) in the event of voluntary withdrawal or dismissal from the

Congregation she understood that the sponsorship ends, and that Maryknoll was required to report the cession of the sponsorship to the United States Immigration and Naturalization Services: and (4) if she withdrew or was dismissed, she would need to return to Tanzania as her Maryknoll immigration sponsorship would be over. *See* Hockman Dec. ¶ 12 and Exhibit T thereto.

54. By signing the Agreement Regarding Compensation, Plaintiff agreed to conform to the rules of the Congregation as stated in the Constitutions:

> (2) that all services rendered by [Plaintiff to the Congregation] … shall be given to the Congregation as compensation for lodging … and that said lodging shall be the only recompense or consideration for any services or salaries rendered, and (3) in case of dismissal from the Congregation, or voluntary withdrawal there from, said Immaculata Tegete hereby agrees that she will make no claim of any kind against said Congregation … for services or salaries rendered or for any other cause or thing whatsoever.

*See* Exhibit U to Hockman Dec.

55. The Agreement Regarding Compensation is signed by all Maryknoll novices. *See* Exhibit V to Coppola Aff.

56. On July 18, 2012, Plaintiff signed her request to make First Temporary Profession as a member of the Maryknoll Sisters Congregation. *See* Exhibit W to Coppola Aff. and Exhibit C to Coppola Aff. at 342:10-21.

57. On August 12, 2012, before friends and the Congregation, Plaintiff voluntarily professed vows of poverty, chastity, and obedience. *See* Exhibit C to Coppola Aff. at 343-344 and Exhibit X to Coppola Aff.

58. Plaintiff was not physically threatened or physically harmed while in Chicago. *See* Exhibit C to Coppola Aff. at 294:1-9.

59. Plaintiff (like all Maryknoll novices) was asked to assist with community chores.

*See* Kastner Dec. ¶ 8.

60. Plaintiff chafed at doing so because she considered such work beneath her station. *See* Kastner Dec. ¶ 9.

61. When in Tanzania, she had lived alone and hired people to do her laundry, cleaning, and some cooking. *See* Exhibit C to Coppola Aff. at 57:10-13 and 127:4-25.

62. A paid "house girl" cooked and did dishes for Plaintiff in Tanzania. *See* Exhibit C to Coppola Aff. at 172:9-24.

63. Maryknoll, however, required all Sisters (from novices like Plaintiff to members of the Formation Team) to participate in these types of daily chores. *See* Kastner Dec. ¶ 10 and Exhibit D to Coppola Aff. at 71:12-14, 73:13-19, and 74:1-16.

64. This communal living and working are central parts of Maryknoll way of life and therefore of the Orientation Program's introduction to that lifestyle. *See* Kastner Dec. ¶ 11.

65. Plaintiff freely joined the Congregation knowing these requirements. *See* Kastner Dec. ¶ 12.

66. Plaintiff objected and sometimes also refused to help with chores. *See* Kastner Dec. ¶ 13.

67. Plaintiff was never prevented from communicating with individuals outside Maryknoll. *See* Declaration of Sr. Darlene Jacobs, MM, executed January 26, 2022 ("Jacobs Dec.") ¶ 2.

68. Plaintiff had a laptop and Skyped with friends in Tanzania while she was in New York. *See* Exhibit C to Coppola Aff. at 271:12-25, 272, 273, and 274:1-12.

69. Plaintiff also Skyped with Father Honoratus Mwageni, her mentor and a priest originally from Tanzania who resided in Chicago. *See* Exhibit C to Coppola Aff. at 300:5-12 and

Exhibit H to Coppola Aff. at 7.

70. In 2011, Father Mwageni bought Plaintiff a cell phone, which she could and did use. *See* Exhibit C to Coppola Aff. at 300:13-24.

71. Also, she spoke by telephone with her family in Tanzania. *See* Exhibit C to Coppola Aff. at 300:19-24.

72. After the Formation Period and professing First Vows, Plaintiff engaged in a discernment process in anticipation of being given a mission assignment. *See* Jacobs Dec. ¶ 3 and Exhibit C to Coppola Aff. at 379:18-25 and 380:1-19.

73. Plaintiff was given three choices for her mission location. *See* Exhibit C to Coppola Aff. at 379:24-25 and 380:1-11.

74. Plaintiff asked to be assigned to Maryknoll's Panama mission because: (1) it was "a multicultural region;" (2) there was "diversity of community living;" and (3) there was "a chance for [her to get involved] in the ministries." *See* Exhibit Y to Coppola Aff. at 00016.

75. On October 10, 2012, after a lengthy period of study and discernment, Maryknoll assigned Plaintiff to Panama as she requested. *See* Exhibit Z to Coppola Aff.

76. Plaintiff's studies included scholastic studies as well as conversations with Maryknoll Sisters from particular regions. *See* Jacobs Dec. ¶ 4.

77. On November 15, 2012, Plaintiff traveled back to Tanzania for her "home visit" before embarking on her mission assignment in Panama. *See* Exhibit A to Coppola Aff. ¶ 125, Exhibit C to Coppola Aff. at 346:25 and 347:1-24, and Exhibit Q to Coppola Aff.

78. It is customary that after making First Vows but before her mission assignment, a Maryknoll Sister returns home to visit her family. *See* Jacobs Dec. ¶ 5.

79. Plaintiff testified that: (1) Sr. Aurora De la Cruz retrieved Plaintiff's passport

before she boarded a flight to Tanzania; and (2) no one in the Congregation forced her to leave Tanzania for Panama when she did so in April 2013. *See* Exhibit C to Coppola Aff. at 348:3-20, 387:12-14, 392:13-18 and Exhibit Q to Coppola Aff.

80. When she traveled to Panama, she retained possession of her passport. *See* Exhibit C to Coppola Aff. at 392:14-16 and Exhibit Q to Coppola Aff.

81. Plaintiff also knew and agreed that her mission assignment in Panama was for three to five years. *See* Exhibit V to Coppola Aff. at 00225 and Exhibit AA to Coppola Aff.

82. Section 160.02 of the Complementary Document states in pertinent part: "The Mission Phase experience of integration into a regional culture, community and ministry is not less than three (3) years nor ordinarily more than five (5) years in length." *See* Exhibit V to Coppola Aff. at 00225.

83. While on mission in Panama, Plaintiff completed an intensive Spanish-language program in Panama City, volunteered at a halfway home for children with terminal cancer, and then worked with other Maryknoll Sisters who were volunteering in the parish of Las Mananitas and working with indigenous women. *See* Exhibit A to Coppola Aff. at ¶ 148, Exhibit C to Coppola Aff. at 396:3-18 and 408:11-18, Exhibit I to Coppola Aff. at 46:9-24, 47, 48:1-24, and 50:3-18, Exhibit X to Coppola Aff., Exhibit BB to Coppola Aff., and Exhibit CC to Coppola Aff.

84. In an e-mail to Sr. Janice McLaughlin, the former President of the Maryknoll Sisters, dated October 9, 2013, Plaintiff wrote:

> I have just completed my basic training in Spanish language early of this month of October and moved into Darien where I am right now. That is another page of the mission phase. … After then, I'll get a chance to go to learn about the community of Las Mananitas. … I have fallen in love with panama country and its people. Because, all these times of being here beside language, I took advantage of learning about the people whom I will be sharing life in ministry. Now it is time I am engaging to learn about my own

family of Sisters in Panama."

*See* Exhibit DD to Coppola Aff.

85. Plaintiff subsequently found issues with her living situation in Panama. *See* Exhibit C to Coppola Aff. at 398:7-24 and 404:14-16 and Exhibit EE to Coppola Aff.

86. Plaintiff was unhappy: (1) living with a woman who smoked cigarettes during Plaintiff's language study; and (2) later with her accommodations that included Sisters who had pets. *See* Exhibit C to Coppola Aff. at 398:7-24 and 404:14-16 and Exhibit EE to Coppola Aff.

87. Sr. Euphrasia Nyaki, a Maryknoll Sister originally from Tanzania, advised Plaintiff in an e-mail to be patient saying in pertinent part that "[c]ommunity living challenges for Maryknoll Sisters are many" and that "Maryknoll life, especially community life, isn't easy." *See* Exhibit G to Coppola Aff. at 10:20-21 and Exhibit EE to Coppola Aff.

88. While in Panama, no one at Maryknoll physically threatened Plaintiff. *See* Exhibit C to Coppola Aff. at 427:20-23.

89. Plaintiff had free use of her laptop while in Panama and continued to communicate with Fr. Honoratus via Skype from Panama. *See* Exhibit C to Coppola Aff. at 436:4-25 and 456:5-7.

90. She also had a cell phone while in Panama. *See* Exhibit C to Coppola Aff. at 456:3-4.

91. Plaintiff's friends, Jean Enneking and Katie Sullivan, whom she had initially met at the Maryknoll Center in 2010, visited Plaintiff in Panama. *See* Exhibit C to Coppola Aff. at 437:14-25 and 438:1-5 and Exhibit I to Coppola Aff. at 35:8-13 and 36:1-12.

92. Plaintiff visited the Panama Canal and attended Mass with her two friends. *See* Exhibit C to Coppola Aff. at 440:1-21.

93. Ms. Enneking witnessed Plaintiff serve as a missionary in Panama, which included working with middle-aged women and regularly volunteering at a cancer clinic for children. *See* Exhibit I to Coppola Aff. at 46:9-25 and 48.

94. Plaintiff was free to and in fact did receive medical care for fibroids and allergies in Panama. *See* Exhibit FF to Coppola Aff.

95. On August 25, 2014, and at Maryknoll's invitation, Plaintiff flew from Panama to New York, with her passport, to attend Maryknoll's General Assembly as an official participant. *See* Exhibit A to Coppola Aff. ¶ 194; Exhibit C to Coppola Aff. at 337:12-17, 446:14-17, 447:11, 448:4-5, 448:13-14, and 450:6-8; Exhibit GG to Coppola Aff.; and Jacobs Dec. ¶ 6.

96. At Maryknoll's expense, Plaintiff stayed at the Hilton Hotel in Woodcliff Lake, New Jersey between September 7 and 21, 2014. *See* Exhibit C to Coppola Aff. at 448:13-14 and Jacobs Dec. ¶ 7.

97. Plaintiff was free to come and go as she wished. *See* Jacobs Dec. ¶ 8.

98. After the conference, Plaintiff took a two-week vacation to visit friends in Albany, Minnesota. *See* Exhibit C to Coppola Aff. at 327:4-11, 328:1-13, 329:1-6, 331:9-12, 333:16-21, and Exhibit HH to Coppola Aff.

99. Plaintiff had her passport and visa with her when she traveled from New York to Minnesota. *See* Exhibit C to Coppola Aff. at 337:9-23.

100. Upon Plaintiff's return to New York from Panama, her passport remained in her possession. *See* Exhibit C to Coppola Aff. at 337:12-17.

101. Once back in New York, Plaintiff continued to communicate with Ms. Enneking via e-mail and Father Honoratus via Skype. *See* Exhibit C to Coppola Aff. at 457:5-10 and 16-22.

102. One of the Maryknoll Sisters drove Plaintiff to the New York Department of Motor Vehicles ("DMV") in Peekskill, New York, so that Plaintiff could obtain a New York State driver's license. *See* Exhibit C to Coppola Aff. at 353:1-24.

103. Plaintiff presented her passport and social security card to the DMV, which issued her a driver's license *See* Exhibit C to Coppola Aff. at 352:6:16 and 353:1-4.

104. Plaintiff previously had obtained an Illinois driver's license while in Chicago during her Orientation Program. *See* Exhibit C to Coppola Aff. at 454:6-24.

105. After her vacation in Minnesota, Plaintiff returned to Maryknoll residence in Westchester. *See* Exhibit C to Coppola Aff. at 338:9-18.

106. There, Sr. Bernice Rigney, the Co-Director of Congregational Personnel Department, asked Plaintiff to return to Panama to continue her mission phase (a three-to-five-year commitment). *See* Exhibit C to Coppola Aff. at 463:22-24 and 464:1-10 and Exhibit V to Coppola Aff.

107. It was then that Plaintiff asked the Leadership to be assigned to a different mission location. *See* Exhibit E to Coppola Aff. at 44:23-25 and 45:1-17.

108. When Plaintiff was asked to continue in Panama because she had not spent enough time there to make such a decision, she requested more time for discernment in New York. *See* Exhibit II to Coppola Aff.

109. Sr. Rebecca Macugay, Vice-President of Maryknoll, met with Plaintiff at the Maryknoll Residence. *See* Exhibit II to Coppola Aff.

110. Sr. Macugay asked Plaintiff to continue her discernment in Panama because that was her assignment. *See* Exhibit II to Coppola Aff.

111. Plaintiff confided in particular Maryknoll Sisters – specifically Sr. Efu and Sr.

Elizabeth Terbrock. *See* Exhibit G to Coppola Aff. at 25:3-13 and Exhibit EE to Coppola Aff.

112. Plaintiff complained to both about her unfulfilled expectations. *See* Exhibit C to Coppola Aff. at 260:9-24 and Exhibit EE to Coppola Aff.

113. Sr. Terbrock assisted Plaintiff with drafting a letter to Sr. Gerri Brake, Personnel Coordinator Panama Mission Presence, and the Panama Mission Presence Sisters, which stated in pertinent part:

> … I would like to communicate directly to you the reason that I cannot think of returning to Panama at this time. My reason *is only* that I have experienced strong allergic reactions to animals – dogs, cats – that are allowed to live and roam freely throughout all three of the local community houses in the Panama region. *It is not a matter of problems with anything else*.
>
> At this moment I am planning to meet with the Congregational Leadership team in order to explain my reasons for not returning to Panama, and to ask if they can offer me any other possibilities/options for my Mission Phase.

*See* Exhibit JJ to Coppola Aff. (emphasis added).

114. On November 8, 2014, Sr. Brake e-mailed Plaintiff in response. *See* Exhibit KK to Coppola Aff.

115. In this e-mail Sr. Brake outlined some of the accommodations Maryknoll had made for Plaintiff because of her complaints about communal living in Panama:

> We are all very concerned for your good health and well-being, as we've always been and feel that we've made adjustments and tried to respond as well as we could given there is nothing on your medical record from Wellness Center indicating any allergies whatsoever.
>
> …
>
> [Sister] Melinda [Roper] brought you to the Health Center … Melinda recommended that you get a test to find out what antibiotics you are allergic to for future reference.
>
> …

> About cats and dogs in our homes, all the houses in the Region have made adjustments to address your expressed allergies of them. In fact none of the houses have been allowing any animal to stay in-doors overnight.
>
> …
>
> I just really want to remind you that we have made some adjustments and apologize if they were insufficient. We are willing to make more adjustments in consideration of your health. In fact, we have already planned to bring you for a general Allergy evaluation and have an allergist to attend to you. All of these only reflect to our being very committed to facilitate a continuing good Mission Phase for you.

*See* Exhibit KK to Coppola Aff.

116. In a letter dated December 1, 2014, Leadership requested that Plaintiff return to Panama to continue her mission phase and outlined steps that Leadership recommended that the Panama Mission Presence Sisters take to further accommodate Plaintiff upon her return. *See* Exhibit LL to Coppola Aff.

117. These additional accommodations included: (1) schedule "an immediate appointment with an Allergist … in order to have a correct prescription for medication needed;" (2) remove the two dogs at Las Mananitas while Plaintiff's health situation was assessed; (3) encourage regular reflection and meeting of communities with the Sisters in the mission phase and mentoring of Sisters in the mission phase; and (4) support and give feedback to Plaintiff regarding her mission plan. *See* Exhibit LL to Coppola Aff.

118. Plaintiff decided not to return to Panama. *See* Exhibit C to Coppola Aff. at 465:19.

119. Maryknoll's Congregational Policies provide that each Maryknoll Sister is responsible for maintaining her own health. *See* Exhibit MM to Coppola Aff. and Exhibit AA to Coppola Aff. at 01360.

120. Maryknoll provided Plaintiff with medical care and necessary medical treatment while she was with Maryknoll in New York, Chicago, and Panama. *See* Exhibit NN to Coppola Aff.

121. On May 27, 2011, a myomectomy was performed on Plaintiff at Northern Westchester Hospital to treat her uterine fibroids and excessive bleeding. *See* Exhibit C to Coppola Aff. at 257:8-21 and Exhibit NN to Coppola Aff. at 01702, 01575, and 01385-01389.

122. While in Chicago, Plaintiff also received dental work and was treated for an infection in her leg at the University of Chicago. *See* Exhibit C to Coppola Aff. at 258:15-25 and 314:20-25, 315, 316:1-23, 317:1-8, and Exhibit NN to Coppola Aff. at 00565-00567.

123. Plaintiff also received medical care for her allergies and uterine fibroids in Panama. *See* Exhibit FF to Coppola Aff.

124. Maryknoll paid for all of Plaintiff's medical procedures and treatments wherever she was in the world. *See* Exhibit C to Coppola Aff. at 257:20-21, 315:11-12, and 317:5-8.

125. On December 12, 2014, Maryknoll released Plaintiff from her vows "so that [she] may explore other possibilities for [her] life." *See* Exhibit OO to Coppola Aff.

126. Maryknoll purchased a plane ticket to Tanzania for Plaintiff and gave Plaintiff: (1) her dowry consisting of $200.00; (2) travel money in the form of $500.00 cash; and (3) copies of her birth certificate and baptismal certificate. *See* Exhibit C to Coppola Aff. at 481:4-22, Exhibit R to Coppola Aff., Exhibit OO to Coppola Aff. and Exhibit PP to Coppola Aff.

127. Plaintiff decided not to use the ticket to return to Tanzania, wanting to remain in the United States. *See* Exhibit PP to Coppola Aff.

128. After Plaintiff was released from her vows. Maryknoll offered Plaintiff $5,000.00 upon her return to Tanzania to assist with her acclimation back in her home country. *See* Exhibit

C to Coppola Aff. at 488:17-25; 489:1-16 and Jacobs Dec. ¶ 9.

129. Section 191 of the Maryknoll Complementary Document states women who leave the Congregation are provided with financial assistance and a place ticket back to their home country. *See* Exhibit V to Coppola Aff.

130. The $5,000.00 was to be given to Plaintiff in Tanzania through the Maryknoll Sisters Tanzania Region. *See* Jacobs Dec. ¶ 10.

131. After Plaintiff left the Congregation, she e-mailed Sr. McLaughlin requesting $5,000.00. *See* Exhibit C to Coppola Aff. at 488:22-25 and 489:1-3.

132. On March 21, 2015, Plaintiff, who was and to this day still resides in the United States, accepted the $5,000.00 from Maryknoll. *See* Exhibit C to Coppola Aff. at 489:1-3 and Exhibit QQ to Coppola Aff.

133. By signing her Declaration of Acceptance of an Indult of Departure for a Sister in Temporary Profession on December 15, 2014, Plaintiff affirmed and agreed that she had "no right to any remuneration of the religious congregation and corporation of the Maryknoll Sisters of St. Dominic, of Maryknoll, New York, the same having been waived by [her] at the time of [her] entrance into said Religious Congregation in view of benefits accruing to [her] from membership therein." *See* Exhibit R to Coppola Aff.

Dated: New York, New York
January 28, 2022

Respectfully Submitted,
CULLEN and DYKMAN LLP
Attorneys for Defendant

By: ______________________
Richard A. Coppola, Esq.
RC6624
44 Wall Street, 17th Floor
New York, New York 10005
(212) 510-2250
rcoppola@cullenllp.com