UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
IMMACULATA TEGETE,

Plaintiff, 7:20-cv-05023 (CS)

-against-

MARYKNOLL SISTERS OF SAINT DOMINIC, INC.,
MARYKNOLL COMMUNITIES, INC.

Defendants.
------------------------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

CULLEN AND DYKMAN LLP
Richard A. Coppola
RC6624
44 Wall Street, 17th Floor
New York, New York 10005
(212) 510-2250
rcoppola@cullenllp.com
Attorneys for Defendant

TABLE OF CONTENTS

INTRODUCTION ....................................................1

PRELIMINARY STATEMENT ....................................................1

STATEMENT OF FACTS ....................................................5

ARGUMENT ....................................................17

POINT I ....................................................17

THERE IS NO EVIDENCE THAT MARYKNOLL KNOWINGLY SUBJECTED PLAINTIFF TO FORCED LABOR AND, AS A RESULT, PLAINTIFF'S 18 U.S.C. § 1589 CLAIM SHOULD BE DISMISSED ....................................................17

POINT II ....................................................22

PLAINTIFF'S DOCUMENT SERVITUDE CLAIMS UNDER 18 U.S.C. 1592 SHOULD BE DISMISSED BECAUSE THE PREDICATE OFFENSE OF FORCED LABOR FAILS AND HER PASSPORT WAS MADE AVAILABLE TO AND IN FACT GIVEN TO HER WHEN SHE REQUESTED IT ....................................................22

POINT III ....................................................24

THE ENTICEMENT INTO SLAVERY CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF ADMITTED SHE JOINED MARYKNOLL AND CAME TO THE UNITED STATES VOLUNTARILY ....................................................24

POINT IV ....................................................24

ALTERNATIVELY, THE FIRST AMENDMENT'S MINISTERIAL EXCEPTION BARS PLAINTIFF'S TVPRA CLAIMS ....................................................24

CONCLUSION ....................................................25

TABLE OF AUTHORITIES

**Cases**

*Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 598 F.3d 668 (9th Cir. 2010).............25

*Garnica v. Edwards*, 72 F.Supp.3d 411 (S.D.N.Y. 2014) ........................................................21

*Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012)....................................22

*Mallela v. Cogent Infotech Corp.*, No. 2:19-cv-01658, 2020 WL 2541860 (W.D. Pa. May 19, 2020)..........................................................................................................................23

*Martinez-Rodriguez v. Giles*, 391 F.Supp.3d 985 (D. Idaho 2019) ...........................................20

*Muchira v. Al-Rawaf*, 1:14-cv-770, 2015 WL 1787144 (E.D.Va. April 15, 2015)........18, 19, 23

*Saraswat v. Business Integra, Inc.*, 15-cv-4680, 2019 WL 1865193 (E.D.N.Y. April 25, 2019)..........................................................................................................................22

*Stein v. World-Wide Plumbing Supply Inc.*, 71 F.Supp.3d 320 (E.D.N.Y. 2014) ......................24

*United States v. Alstatt*, 858 F.Supp.2d 1032 (D. Neb. 2012) ..................................................23

*Velez v. Sanchez*, 754 F.Supp.2d 488 (E.D.N.Y. 2010)............................................................21

*Werft v. Desert Southwest Annual Conference of the United Methodist Church*, 377 F.3d 1099 (9th Cir. 2004) .............................................................................................25

**Statutes**

18 U.S.C. § 1583..........................................................................................................24

18 U.S.C. § 1589................................................................................................17, 18, 19

18 U.S.C. § 1592.......................................................................................................22, 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
IMMACULATA TEGETE,

Plaintiff,

-against- 7:20-cv-05023 (CS)

MARYKNOLL SISTERS OF SAINT DOMINIC, INC.,
MARYKNOLL COMMUNITIES, INC.

Defendants.
-------------------------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Defendant, Maryknoll Sisters of St. Dominic, Inc. ("Maryknoll") respectfully submits this memorandum of law in support of Defendant's motion, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissing all causes of action in the complaint. The undisputed facts revealed during discovery prove that Maryknoll, the first United States based congregation of Roman Catholic religious women dedicated to foreign mission, did not subject plaintiff Immaculata Tegete ("Plaintiff") to human trafficking, forced labor, or slavery. As a result, Sections 1583, 1589, and 1592[1] of the Trafficking Victims Protection Reauthorization Act ("TVPRA") were not violated, and the complaint should be dismissed with prejudice.

## PRELIMINARY STATEMENT

Plaintiff has filed outrageous claims against Maryknoll. Plaintiff alleges that in the nearly four and one-half years she was affiliated with the Maryknoll Sisters Congregation (the "Congregation"), she was subject to acts of human trafficking, forced labor, and slavery. The

---

[1] Plaintiff cites to 18 U.S.C. § 1599 in her Complaint. There is so such section. Defendant presumes Plaintiff is referring to 18 U.S.C. § 1592.

claims are utterly baseless.

Maryknoll are religious missionaries who dedicate their lives to the Congregation's work in education, health care ministry, and social justice around the world. Since its founding in 1912, over 3,000 women have entered the Congregation with the intention of testing their vocation to a religious missionary life of selflessness and devotion to others. For some, like Plaintiff, this life option does not work out. Novices have left, or been asked to leave, for different reasons, all related to mutual discernment – the process of verifying between the novice and Maryknoll whether life as a missionary nun is the right "fit."[2]

Contemporaneous documents and testimony of others with whom Plaintiff interacted during her time with Maryknoll establish her claims have no merit whatsoever. Plaintiff's own testimony confirms that she freely joined Maryknoll and in July 2010 came to the United States under her own free will.

Contrary to Plaintiff's allegations that she was (1) shut off from family and friends, (2) denied the ability to move freely, (3) "severely injured bodily, emotionally, and psychologically," and (4) not given necessary medical treatment, Maryknoll went to great lengths to address all of Plaintiff's many and varied complaints. Plaintiff had free access to communication, including her own laptop and cell phone. She regularly communicated with family, friends, and her mentor, a Catholic priest originally from Tanzania. She traveled freely within the strictures of a communal religious order – including enjoying a two-week vacation to visit friends in Minnesota and a five month return trip home to Tanzania to visit family. The evidence establishes that Plaintiff also was regularly treated in New York, Chicago, and Panama

[2] Maryknoll were not the only religious order that did not end up being a good fit for Plaintiff. Earlier in life, Plaintiff had joined the Benedictine Sisters in Tanzania. Plaintiff quit that religious order after four years.

for her medical complaints – all paid for by Maryknoll. Despite this care, and even further accommodations that Maryknoll offered her, Plaintiff was unhappy with her mission assignment in Panama. Plaintiff makes clear that she was looking for a situation that "was perfect."[3] The life of a missionary nun is not "perfect," but rather is difficult as it requires each to live in poverty and obedience. Plaintiff clearly was not equipped to handle the hard-working life of a Maryknoll missionary in a third world country. She chafed at the regular tasks required of nuns working in a communal organization. These facts, however, do not translate to trafficking, forced labor, and slavery.

Maryknoll, after denying her request for reassignment from Panama several years before the end of her agreed upon commitment there, realized that Plaintiff could not handle the difficult life of a Maryknoll nun. They released Plaintiff from her vows. Maryknoll then bought Plaintiff a plane ticket to fly back to her home in Tanzania and gave her cash for the trip. And ultimately, they gave her an additional $5,000.00 (an amount that was to be paid to her after she returned home to Tanzania and was earmarked to assist her in reestablishing her life there). She never returned home but she also never returned the $5,000.00.

Among the many disgraceful and wholly fabricated allegations in Plaintiff's complaint is that if she were to end her association with Maryknoll and return to Tanzania, she would end up "destitute"[4] and "forced to live off the [Tanzanian] streets as a beggar."[5] These shameful claims are belied by Plaintiff's own allegations in the Complaint that she (1) was born and raised in Tanzania and grew up in a devout family[6], (2) was well educated – she attended secondary

---

[3] *See* Complaint ¶ 39
[4] *See* Complaint ¶ 135.
[5] *See* Complaint ¶ 179.
[6] *See* Complaint ¶¶ 13-14.

school and received a certificate in theology from Mgazini Seminary[7], (3) subsequently worked as a teacher[8], (4) performed administrative and accounting work for Diocese of Mbinga[9], (5) was an administrator of a 350 bed hospital[10], and (6) "was successful by any measure" in her home country[11]. With that background and the $5,000.00 transition payment from Maryknoll, Plaintiff would be able to reestablish a secular life in Tanzania – and not be "destitute" or a "beggar."

Equally false are Plaintiff's claims that Maryknoll confiscated and hid her passport and other personal identifying documents, so they could prevent her from leaving. The evidence instead establishes that upon arriving at Maryknoll's headquarters in New York, Plaintiff's passport was taken to the Congregation's Secretariat's office for safekeeping, because, as Plaintiff freely admitted, there was no safe or other secure place to lock these documents in her bedroom. Plaintiff could, and in fact did, access her passport at any time. She also obtained Illinois and New York drivers' licenses and a social security card (which she retained possession of) during her time as a "slave."

When granting a defendant summary judgment in claims brought under TVPRA, federal courts look to the following facts as dispositive: (1) the alleged victim came to the United States voluntarily, (2) the alleged victim was fluent in English, (3) there was no physical abuse, (4) there were no threats of physical violence, (5) the alleged victim was not restrained or impeded from leaving, (6) the alleged victim was not prevented from communicating with others, (7) the passport was kept for security reasons, not to prevent travel, (8) the alleged victim had a driver's license, (9) there was no threat of deportation but merely a statement of the actual legal

[7] *See* Complaint ¶¶ 18-19.
[8] *See* Complaint ¶ 20.
[9] *See* Complaint ¶¶ 20-21.
[10] *See* Complaint ¶ 23.
[11] *See* Complaint ¶ 26.

consequences, and (10) successfully leaving the defendant the first time the alleged victim attempts to do so. *See* Argument Section, pgs. 17-24. All of these factors are present in this case.

Plaintiff waited nearly six years to bring her claims. The facts here reflect a situation where a novice was not able to live the difficult life of a missionary nun. This is a situation where a candidate's expectations differed from the reality of religious life and community living. Plaintiff's complaint should be dismissed, with prejudice.

## STATEMENT OF FACTS

**<u>Plaintiff Reached Out to Maryknoll and Freely Entered into the Admission Process</u>**

Plaintiff Immaculata Tegete was raised in a Roman Catholic family in Mbinga, Tanzania. *See* Defendant's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("SMF") ¶1. Plaintiff testified that she attended Mass with her parents every Sunday. *See* SMF ¶2. One of Plaintiff's uncles was a priest for the Diocese of Dar Es Salaam, and another was a missionary priest. *See* SMF ¶3. Plaintiff was college educated and also took courses in accounting and administration while in Tanzania. *See* SMF ¶4.

Before encountering Maryknoll, Plaintiff already knew what being part of a religious order entailed, and specifically that she could freely leave a religious order. She previously had done so. *See* SMF ¶5. In or about 1996, Plaintiff joined the Benedictine Sisters of Peramiho, Tanzania (the "Benedictine Sisters"), whose mission was to serve locally by teaching Catholic catechism, religious studies, and the Bible. *See* SMF ¶6. Plaintiff joined this religious order as a Postulant. *See* SMF ¶7. The Benedictine Sisters paid for Plaintiff to attend and study theology at Theological College in Mgazini, Tanzania. *See* SMF ¶8. Plaintiff testified she left the Benedictine Sisters around 2000 (also a four-year term) because that religious order did not offer her the international mission experience she desired. *See* SMF ¶9. Immediately thereafter, Plaintiff visited Bishop Emanuel Mapunda who hired her as an administrator of a hospital in

Litembo. *See* SMF ¶10. Plaintiff later worked as a secretary and an accounting clerk for Bishop Mapunda in Mbinga. *See* SMF ¶11.

In September 2007, after seeing a reference to Maryknoll in a Catholic directory in Tanzania, Plaintiff initiated contact, writing a letter to Maryknoll in Dar Es Salaam, Tanzania. *See* SMF ¶12. In the letter, Plaintiff inquired about Maryknoll since she was "trying to find out which mission religious order [she would] be inspired to join." *See* SMF ¶13. Between September 2007 and June 2008, Plaintiff corresponded with Sr. Maureen Meyer who answered her questions and sent her Maryknoll Magazines and other information on Maryknoll. *See* SMF ¶14. In June 2008, Plaintiff met Sr. Janet Srebalus, a member of the Admissions Team for Maryknoll in Tanzania, at the Tanzania Episcopal Conference Hostel. *See* SMF ¶15. Thereafter, Sr. Srebalus was Plaintiff's vocation contact person until 2010 when Plaintiff was accepted by the Congregational Leadership Team ("Leadership") for entrance in the two-year Candidacy Program. *See* SMF ¶16.

Plaintiff then took the following voluntary steps for admission to Maryknoll: (1) wrote a formal letter of application, (2) drafted an autobiography, (3) completed a personal profile form, (4) was interviewed, and (5) participated in her "Live-In"[12] in a Maryknoll community house in Kalebejo, Tanzania (with Sr. Peg M. Donovan) so that she could experience life with Maryknoll. *See* SMF ¶17.

Plaintiff testified that in December 2009, Maryknoll accepted Plaintiff's application to become a novice. *See* SMF ¶19. Thereafter, Maryknoll assisted Plaintiff with obtaining a Religious Worker (R-1) Visa from the United States Citizenship and Immigration Services

[12] As a part of the pre-candidacy stage, a woman is to participate in an at least four month live-in with one of Maryknoll communities and enters into their life mission as fully as possible. *See* SMF ¶ 18.

("USCIS"). *See* SMF ¶20. As part of that process, Maryknoll verified that they would be responsible for Plaintiff's needs while she resided in the United States. *See* SMF ¶21. In mid-2010, Plaintiff's R-1 Visa was approved. *See* SMF ¶22.

**Plaintiff Voluntarily Traveled to the United States and Was Welcomed to Live as a Maryknoll Novice**

On July 5, 2010, Plaintiff, who was then 37 years old, flew from Tanzania to New York. *See* SMF ¶23. Plaintiff admitted she was not forced to come to America. She came of her own free will. *See* SMF ¶24. Plaintiff also admitted that she was legally in the United States at all times while she was associated with Maryknoll. *See* SMF ¶25.

For the months of July and August 2010, Plaintiff resided at Maryknoll Center in Ossining, New York. *See* SMF ¶26. There she acclimated herself with religious life specific to the Congregation and became acquainted with Maryknoll. *See* SMF ¶27. Between early July and late August 2010, Plaintiff attended Mass, took English lessons, participated in vocational gatherings, and had ministry time. *See* SMF ¶28.

Shortly after arriving in the United States, Sr. Janet Hockman, Director of the Admissions (Vocations) Department for Maryknoll from 2009 through 2014, accompanied Plaintiff to obtain a social security card in Peekskill, New York. *See* SMF ¶29. Plaintiff needed her passport to obtain her social security card. *See* SMF ¶30. On July 20, 2010, Plaintiff was issued a social security number and card, which she needed to register for school and enroll in classes at Catholic Theological Union in Chicago. *See* SMF ¶31.

Plaintiff's original passport (with her visa inside the passport) was taken to a secure office at the Maryknoll residence known as the Secretariat office for safekeeping. *See* SMF ¶32. All important documents of Maryknoll are safeguarded in the Congregation's Secretariat office. *See* SMF ¶33. As Plaintiff testified, there was no lock on Plaintiff's bedroom or secure place to

keep her personal documents in her bedroom. *See* SMF ¶34. Plaintiff never asked any of the Maryknoll Sisters where her passport was stored. *See* SMF ¶35. Plaintiff testified that she knew Sr. Hockman was keeping her passport and "trusted" that Sr. Hockman would "give [it to her] when she's ready to give [to her]." *See* SMF ¶36. Plaintiff also admitted that she did not tell any of the Maryknoll Sisters, at any time, that she preferred to keep her passport in her possession. *See* SMF ¶37. Plaintiff could have access to her passport whenever she desired it. *See* SMF ¶38. Indeed, the evidence is clear that Plaintiff was given her passport every time she requested it. *See* SMF ¶39. Plaintiff testified that her other personal documents stayed in her possession while she was at Maryknoll. *See* SMF ¶40.

On August 8, 2010, Maryknoll formally accepted Plaintiff as a novice candidate. *See* SMF ¶41. In the fall of 2010, Plaintiff, along with one other Maryknoll novice, went to live in Chicago at Maryknoll's Orientation House. *See* SMF ¶42. There Plaintiff and the other novice began their formal orientation to live as a Maryknoll Sister. *See* SMF ¶43. Plaintiff testified that Sr. Theresa Kastner and Sr. Shu Chen Wu, co-directors of Maryknoll's orientation program (the "Orientation Program"), returned Plaintiff's passport to her before she traveled to Chicago. *See* SMF ¶44.

**<u>Plaintiff Freely Entered into a Religious Life with the Maryknoll Sisters</u>**

During a two-year period known as the Integration or Formation Period, a novice discerns whether Maryknoll's form of religious life "fits" with her expectations. *See* SMF ¶45. During the Formation Period, novices study Maryknoll documents, live in community life, pray together, further study theology and scripture, and do some mission work. *See* SMF ¶46. Plaintiff admits that she was aware of these tasks before she left Tanzania, but now complains that there was not enough time for personal prayer and communal prayer during the Integration Phase. *See* SMF ¶47.

Plaintiff participated in the Orientation Program. *See* SMF ¶48. Orientation included (1) auditing theological studies at Catholic Theological Union in Chicago, including a once weekly, all day, Inter-Congregational Program of Theological/Spiritual/Psychological lectures (together with other men and women in their Congregations' Formation Programs), (2) participating in a weekly day of prayer and study of Maryknoll History and Constitutions, (3) working at an outreach ministry for the poor, and (4) participating in the daily life of the Maryknoll Sisters' community. *See* SMF ¶49. Plaintiff, along with other novices and Maryknoll Sisters, worked as a volunteer in a soup kitchen, which provided food to the homeless, and she did clerical work at a local parish. *See* SMF ¶50. She also worked at the University of Chicago Medical Center in the Chaplain Department, distributing Holy Communion to the sick and visiting and saying prayers with them. *See* SMF ¶51.

On July 1, 2011, Plaintiff signed (1) a Memorandum of Understanding Regarding Maryknoll Sisters Sponsorship for a Nonimmigrant Religious Visa ("Memorandum of Understanding") and (2) an Agreement Regarding Compensation for Services Rendered ("Agreement Regarding Compensation"). *See* SMF ¶52. In the Memorandum of Understanding, a document that all Maryknoll candidates from outside the United States execute during the Formation Phase, Plaintiff agreed that (1) as a candidate of Maryknoll she would conform to all of its rules as stated in the Constitutions, (2) as a non-United States citizen, she understood that she was in the United States under the sponsorship of Maryknoll, (3) in the event of voluntary withdrawal or dismissal from the Congregation she understood that the sponsorship ends, and that Maryknoll was required to report the cession of the sponsorship to the United States Immigration and Naturalization Services, and (4) if she withdrew or was dismissed, she would need to return to Tanzania as her Maryknoll immigration sponsorship would be over. *See* SMF

¶53.

By signing the Agreement Regarding Compensation, Plaintiff agreed to conform to the rules of the Congregation as stated in the Constitutions,

> (2) that all services rendered by [Plaintiff to the Congregation] … shall be given to the Congregation as compensation for lodging … and that said lodging shall be the only recompense or consideration for any services or salaries rendered, and (3) in case of dismissal from the Congregation, or voluntary withdrawal there from, said Immaculata Tegete hereby agrees that she will make no claim of any kind against said Congregation … for services or salaries rendered or for any other cause or thing whatsoever."

*See* SMF ¶54. The Agreement Regarding Compensation is signed by all Maryknoll novices. *See* SMF ¶55.

On July 18, 2012, Plaintiff signed her request to make First Temporary Profession as a member of the Maryknoll Sisters Congregation *See* SMF ¶56. On August 12, 2012, before friends and the Congregation, Plaintiff voluntarily professed vows of poverty, chastity, and obedience. *See* SMF ¶57.

Plaintiff admits she was not physically threatened or physically harmed while in Chicago. *See* SMF ¶58. Plaintiff (like all Maryknoll novices) was asked to assist with community chores. *See* SMF ¶59. Plaintiff chafed at doing so because she considered such work beneath her station. *See* SMF ¶60. When in Tanzania, she had lived alone and hired people to do her laundry, cleaning, and some cooking. *See* SMF ¶61. Plaintiff testified that a paid "house girl" cooked and did dishes for her in Tanzania. *See* SMF ¶62. Maryknoll, however, required all Sisters (from novices like Plaintiff to members of the Formation Team) to participate in these types of daily chores. *See* SMF ¶63. This communal living and working are central parts of Maryknoll way of life and therefore of the Orientation program's introduction to that lifestyle. *See* SMF ¶64. Plaintiff freely joined the Congregation knowing these requirements. *See* SMF ¶65. However,

Plaintiff objected and sometimes also refused to help with chores. *See* SMF ¶66.

Plaintiff was never prevented from communicating with individuals outside Maryknoll. *See* SMF ¶67. Plaintiff freely admitted that she had a laptop and Skyped with friends in Tanzania while she was in New York. *See* SMF ¶68. Plaintiff also Skyped with Father Honoratus Mwageni, her mentor and a priest originally from Tanzania who resided in Chicago. *See* SMF ¶69. In 2011, Father Mwageni bought Plaintiff a cell phone, which she could and did use. *See* SMF ¶70. Also, she spoke by telephone with her family in Tanzania. *See* SMF ¶71.

**Plaintiff's Mission Phase**

After the Formation Period and professing First Vows, Plaintiff engaged in a discernment process in anticipation of being given a mission assignment. *See* SMF ¶72. Plaintiff testified that she was given three choices for her mission location. *See* SMF ¶73. Plaintiff asked to be assigned to Maryknoll's Panama mission because (1) it was "a multicultural region," (2) there was "diversity of community living," and (3) there was "a chance for [her to get involved] in the ministries." *See* SMF ¶74. On October 10, 2012, after a lengthy period of study[13] and discernment, Maryknoll assigned Plaintiff to Panama as she requested. *See* SMF ¶75.

On November 15, 2012, Plaintiff traveled back to Tanzania for her "home visit" before embarking on her mission assignment in Panama.[14] *See* SMF ¶77. Plaintiff testified that (1) Sr. Aurora De la Cruz retrieved Plaintiff's passport before she boarded a flight to Tanzania and (2) no one in the Congregation forced her to leave Tanzania for Panama when she did so in April 2013. *See* SMF ¶79. When she traveled to Panama, she retained possession of her passport. *See* SMF ¶80. Plaintiff also knew and agreed that her mission assignment in Panama was for three to

[13] Plaintiff's studies included scholastic studies as well as conversations with Maryknoll Sisters from particular regions. *See* SMF ¶76.
[14] It is customary that after making First Vows but before her mission assignment, a Maryknoll Sister returns home to visit her family. *See* SMF ¶78.

five years. *See* SMF ¶81. Section 160.02 of the Complementary Document states in pertinent part: "The Mission Phase experience of integration into a regional culture, community and ministry is not less than three (3) years nor ordinarily more than five (5) years in length." *See* SMF ¶82.

While on mission in Panama, Plaintiff completed an intensive Spanish-language program in Panama City, volunteered at a halfway home for children with terminal cancer, and then worked with other Maryknoll Sisters who were volunteering in the parish of Las Mananitas and working with indigenous women. *See* SMF ¶83. In an e-mail to Sr. Janice McLaughlin, the former President Maryknoll, dated October 9, 2013, Plaintiff wrote:

> I have just completed my basic training in Spanish language early of this month of October and moved into Darien where I am right now. That is another page of the mission phase. … After then, I'll get a chance to go to learn about the community of Las Mananitas. … I have fallen in love with panama country and its people. Because, all these times of being here beside language, I took advantage of learning about the people whom I will be sharing life in ministry. Now it is time I am engaging to learn about my own family of Sisters in Panama."

*See* SMF ¶84. As Plaintiff's own words make clear, she was excited at the prospect of living and working as a Maryknoll Sister in Panama.

However, Plaintiff subsequently found issues with her living situation in Panama. *See* SMF ¶85. Plaintiff was unhappy (1) living with a woman who smoked cigarettes during Plaintiff's language study and (2) later with her accommodations that included Sisters who had pets. *See* SMF ¶86. Sr. Euphrasia Nyaki, a Maryknoll Sister originally from Tanzania, advised Plaintiff in an e-mail to be patient saying in pertinent part that "[c]ommunity living challenges for Maryknoll Sisters are many" and that "Maryknoll life, especially community life, isn't easy." *See* SMF ¶87. While in Panama, Plaintiff admits that no one at Maryknoll physically threatened

her. *See* SMF ¶88. Plaintiff also concedes she had free use of her laptop while in Panama and continued to communicate with Fr. Honoratus via Skype from Panama. *See* SMF ¶89. She also had a cell phone while in Panama. *See* SMF ¶90. Plaintiff's friends, Jean Enneking and Katie Sullivan, whom she had initially met at the Maryknoll Center in 2010, visited Plaintiff in Panama. *See* SMF ¶91. Plaintiff visited the Panama Canal and attended Mass with her two friends. *See* SMF ¶92. Ms. Enneking testified that she witnessed Plaintiff serve as a missionary in Panama, which included working with middle-aged women and regularly volunteering at a cancer clinic for children. *See* SMF ¶93. Plaintiff also admits she was free to and in fact did receive medical care for fibroids and allergies in Panama. *See* SMF ¶94.

**Plaintiff's Return to New York and Dismissal from the Congregation**

On August 25, 2014, and at Maryknoll's invitation, Plaintiff flew from Panama to New York, with her passport, to attend Maryknoll's General Assembly as an official participant. *See* SMF ¶95. At Maryknoll's expense, Plaintiff stayed at the Hilton Hotel in Woodcliff Lake, New Jersey between September 7 and 21, 2014. *See* SMF ¶96. She was free to come and go as she wished. *See* SMF ¶97.

After the conference, Plaintiff took a two-week vacation to visit friends in Albany, Minnesota. *See* SMF ¶98. Plaintiff admits that she had her passport and visa with her when she traveled from New York to Minnesota. *See* SMF ¶99. Plaintiff testified that upon her return to New York from Panama her passport remained in her possession. *See* SMF ¶100.

Once back in New York, Plaintiff continued to communicate with Ms. Enneking via e-mail and Father Honoratus via Skype. *See* SMF ¶101. One of the Maryknoll Sisters drove Plaintiff to the New York Department of Motor Vehicles ("DMV") in Peekskill, New York, so that Plaintiff could obtain a New York State driver's license. *See* SMF ¶102. Plaintiff presented her passport and social security card to the DMV, which issued her a driver's license. *See* SMF

¶103. Plaintiff also admits that she previously had obtained an Illinois driver's license while in Chicago during her Orientation Program. *See* SMF ¶104.

After her vacation in Minnesota, Plaintiff returned to Maryknoll residence in Westchester. *See* SMF ¶105. There Sr. Bernice Rigney, the Co-Director of Congregational Personnel Department, asked Plaintiff to return to Panama to continue her mission phase (a three-to-five-year commitment). *See* SMF ¶106. It was then that Plaintiff asked the Leadership to be assigned to a different mission location. *See* SMF ¶107. When Plaintiff was asked to continue in Panama because she had not spent enough time there to make such a decision, she requested more time for discernment in New York. *See* SMF ¶108. Sr. Rebecca Macugay, Vice-President of Maryknoll, met with Plaintiff at the Maryknoll Residence. *See* SMF ¶109. Sr. Macugay asked Plaintiff to continue her discernment in Panama because that was her assignment. *See* SMF ¶110.

Plaintiff confided in particular Maryknoll Sisters – specifically Sr. Efu and Sr. Elizabeth Terbrock. *See* SMF ¶111. Plaintiff complained to both about her unfulfilled expectations. *See* SMF ¶112. Sr. Terbrock assisted Plaintiff with drafting a letter to Sr. Gerri Brake, Personnel Coordinator Panama Mission Presence, and the Panama Mission Presence Sisters, which stated in pertinent part:

> … I would like to communicate directly to you the reason that I cannot think of returning to Panama at this time. My reason *is only* that I have experienced strong allergic reactions to animals – dogs, cats – that are allowed to live and roam freely throughout all three of the local community houses in the Panama region. *It is not a matter of problems with anything else*.
>
> At this moment I am planning to meet with the Congregational Leadership team in order to explain my reasons for not returning to Panama, and to ask if they can offer me any other possibilities/options for my Mission Phase.

*See* SMF ¶113 (emphasis added).

On November 8, 2014, Sr. Brake e-mailed Plaintiff in response. *See* SMF ¶114. In this e-

mail Sr. Brake outlined some of the accommodations Maryknoll had made for Plaintiff because of her complaints about communal living in Panama:

> We are all very concerned for your good health and well-being, as we've always been and feel that we've made adjustments and tried to respond as well as we could given there is nothing on your medical record from Wellness Center indicating any allergies whatsoever.
>
> …
>
> [Sister] Melinda [Roper] brought you to the Health Center … Melinda recommended that you get a test to find out what antibiotics you are allergic to for future reference.
>
> …
>
> About cats and dogs in our homes, all the houses in the Region have made adjustments to address your expressed allergies of them. In fact none of the houses have been allowing any animal to stay in-doors overnight.
>
> …
>
> I just really want to remind you that we have made some adjustments and apologize if they were insufficient. We are willing to make more adjustments in consideration of your health. In fact, we have already planned to bring you for a general Allergy evaluation and have an allergist to attend to you. All of these only reflect to our being very committed to facilitate a continuing good Mission Phase for you.

*See* SMF ¶115.

In a letter dated December 1, 2014, Leadership requested that Plaintiff return to Panama to continue her mission phase and outlined steps that Leadership recommended that the Panama Mission Presence Sisters take to further accommodate Plaintiff upon her return. *See* SMF ¶116. These additional accommodations included: (1) schedule "an immediate appointment with an Allergist … in order to have a correct prescription for medication needed," (2) remove the two dogs at Las Mananitas while Plaintiff's health situation was assessed, (3) encourage regular reflection and meeting of communities with the Sisters in the mission phase and mentoring of

Sisters in the mission phase, and (4) support and give feedback to Plaintiff regarding her mission plan. *See* SMF ¶117. Despite these assurances, Plaintiff decided not to return to Panama. *See* SMF ¶118.

Maryknoll's Congregational Policies provide that each Maryknoll Sister (as an adult) is responsible for maintaining her own health. *See* SMF ¶119. Maryknoll provided Plaintiff with medical care and necessary medical treatment while she was with Maryknoll in New York, Chicago, and Panama. *See* SMF ¶120. On May 27, 2011, a myomectomy was performed on Plaintiff at Northern Westchester Hospital to treat her uterine fibroids and excessive bleeding. *See* SMF ¶121. While in Chicago, Plaintiff also received dental work and was treated for an infection in her leg at the University of Chicago. *See* SMF ¶122. Plaintiff also received medical care for her allergies and uterine fibroids in Panama. *See* SMF ¶123. Maryknoll paid for all of Plaintiff's medical procedures and treatments wherever she was in the world. *See* SMF ¶124.

On December 12, 2014, Maryknoll released Plaintiff from her vows "so that [she] may explore other possibilities for [her] life." *See* SMF ¶125. Maryknoll purchased a plane ticket to Tanzania for Plaintiff and gave Plaintiff (1) her dowry consisting of $200.00, (2) travel money in the form of $500.00 cash, and (3) copies of her birth certificate and baptismal certificate. *See* SMF ¶126. Plaintiff decided not to use the ticket to return to Tanzania, wanting to remain in the United States. *See* SMF ¶127. After Plaintiff was released from her vows, Maryknoll offered Plaintiff $5,000.00 upon her return to Tanzania to assist with her acclimation back in her home country.[15] *See* SMF ¶128. The $5,000.00 was to be given to Plaintiff in Tanzania through the Maryknoll Sisters Tanzania Region. *See* SMF ¶130. Plaintiff testified that after she left the

[15] Section 191 of Maryknoll's Complementary Document states women who leave the Congregation are provided with financial assistance and a plane ticket back to their home country. *See* SMF ¶129.

Congregation, she e-mailed Sr. McLaughlin requesting $5,000.00. *See* SMF ¶131. On March 21, 2015, Plaintiff, who was and to this day still resides in the United States, accepted the $5,000.00 from Maryknoll. *See* SMF ¶132.

By signing her Declaration of Acceptance of an Indult of Departure for a Sister in Temporary Profession on December 15, 2014, Plaintiff affirmed and agreed that she had "no right to any remuneration of the religious congregation and corporation of the Maryknoll Sisters of St. Dominic, of Maryknoll, New York, the same having been waived by [her] at the time of [her] entrance into said Religious Congregation in view of benefits accruing to [her] from membership therein." *See* SMF ¶133.

## ARGUMENT

## POINT I

### THERE IS NO EVIDENCE THAT MARYKNOLL KNOWINGLY SUBJECTED PLAINTIFF TO FORCED LABOR AND, AS A RESULT, PLAINTIFF'S 18 U.S.C. § 1589 CLAIM SHOULD BE DISMISSED

18 U.S.C. §1589 provides that it is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person by any one of, or by a combination of, the following means -

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a). "Abuse or threatened abuse of law or legal process" is defined as

> the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. 1589(c)(1). "Serious harm" is defined as

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. 1589(c)(2).

In *Muchira v. Al-Rawaf*, 1:14-cv-770, 2015 WL 1787144 (E.D.Va. April 15, 2015), *aff'd*, 850 F.3d 605 (4th Cir. 2017), a domestic servant from Kenya sued a Saudi national and her three adult children alleging involuntary servitude, illegal trafficking, forced labor, and unlawful conduct with respect to documents. In June 2012, Plaintiff, who was thirty-five years old at the time, signed a contract in Saudi Arabia to work as a housemaid for the defendants in the United States. *Id.* at *1. Plaintiff's duties included assisting defendant Al-Rawaf to prepare meals, clean the house, do laundry, move furniture, and wash windows. *Id.* at *3. Plaintiff regularly communicated with friends and family in the United States and Kenya and a priest from Boston via cell phone (that defendants paid for) and Facebook messaging. *Id.* at *2-3. She was, however, required to comply with the "house rules" that prohibited plaintiff from going outside without defendants' permission and for defendants to retain control of her passport. *Id.* at *3. Plaintiff conceded that she was never physically mistreated, harmed, or restrained or threatened with physical restraint. *Id.* at *6 and *9. In March 2013, with the coordination of a human trafficking task force, plaintiff left defendants' house unassisted. *Id.* at *4. Defendants delivered plaintiff's

passport to the Kenyan embassy approximately one week later. *Id*. at *4.

The district court granted defendants' motion for partial summary judgment dismissing the TVPA claims finding that "[t]here is no evidence sufficient to establish that Defendants coerced, threatened or forced her to accompany them to the United States against her will." *Id*. at *6 and *8. The court held that the evidence was also insufficient as a matter of law to establish that once in the United States, plaintiff was forced into involuntary servitude through defendants' threats of serious harm. *Id*. at *8. The court also rejected plaintiff's claim that she suffered non-physical emotional abuse (in the form of verbal reprimands by defendants and refusals to take her to church or the hospital) that forced her to remain in defendants' employment when she otherwise would have left. *Id*. at *7. Plaintiff's deposition testimony contradicted the conclusory allegations relating to her treatment which led the court to conclude that there was insufficient evidence "as a matter of law for a jury to find that Defendants eliminated her practical ability to extricate herself from her employment." *Id*. at *7. The court dismissed plaintiff's remaining claims under the TVPA, including Section 1592, since there was insufficient evidence in the record to support the predicate offenses of Section 1584 and 1589. *Id*. at *8.

On appeal, plaintiff challenged the district court's granting summary judgment to defendants on her claims relating to forced labor in violation of 18 U.S.C. § 1589. *Muchira v. Al-Rawaf*, 850 F.3d 605, 616 (4th Cir. 2017). The Fourth Circuit affirmed the award of summary judgment to defendants finding the following facts dispositive: (1) plaintiff admitted that she came to the United States willingly, (2) defendants never physically abused her or threatened her or her loved ones with physical harm, (3) defendants never physically restrained or impeded her from leaving her employment situation, and (4) defendants never threatened her with arrest, deportation, adverse immigration consequences, or other legal consequences if she left their

employment. *Id.* at 619-20. The Fourth Circuit stated:

> [S]ection 1589 contains an express *scienter* requirement. There must be evidence … that the employer *intended* to cause the victim to believe that she would suffer serious harm – from the vantage point of the victim – if she did not continue work. The linchpin of the serious harm analysis … is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her if she left her employment.

*Id*. at 618. (internal quotation and citations omitted). The Fourth Circuit determined that the defendants did not knowingly or intentionally obtain the labor and services of plaintiff by means of psychological harm or by means of abuse or threatened abuse of law or legal process. *Id*. at 620.

In *Martinez-Rodriguez v. Giles*, 391 F.Supp.3d 985 (D. Idaho 2019), six veterinarians from Mexico sued a dairy farm and others alleging forced labor and trafficking under the TVPRA. Plaintiffs alleged that upon arrival at the dairy farm, defendants tasked them with menial farm duties, despite plaintiffs' understanding that they would be animal scientists. *Id.* at 990. The veterinarians, however, were free to choose where they lived, obtained driver's licenses and automobiles, traveled within the United States and abroad (some returned to Mexico during their employment and others went on vacation), and were free to control their own finances. *Id.* at 994. The court granted summary judgment for defendants and held that the veterinarians failed to establish that the dairy farm (1) had the requisite *scienter* necessary to establish a violation of § 1589 and (2) obtained their labor by means of serious harm or threats. *Id*. at 997. The court stated that the veterinarians "have not presented any evidence that would indicate that Funk Diary obtained, and kept, their labor *by means of* serious harm, threats, or other improper methods." *Id*. at 994. The court distinguished the high threshold that must be met to be found liable for forced labor under the TVPRA from the material evidence in *Martinez-Rodriguez* stating:

> [A]rduous, demeaning, or even terrible working conditions or employment requirements alone will not suffice. These conditions may precipitate an employee's departure from an employer … but unless those conditions are used *to obtain and keep* an employee's labor, they cannot support a claim of forced labor.

*Id.* at 998 (citation omitted). In briefly addressing plaintiffs' trafficking into servitude claim (18 U.S.C § 1590), the court acknowledged that while there were disappointments, confusion, and unfulfilled promises, it could not conclude "as a matter of law that Funk Dairy *knowingly* recruited (i.e., trafficked into servitude) Plaintiffs in violation of the TVPRA." *Id.* at 1000.

*See also Velez v. Sanchez*, 754 F.Supp.2d 488, 489 (E.D.N.Y. 2010), *aff'd in part, vacated in part* 693 F.3d. 308 (2d Cir. 2012) (dismissing plaintiff's claims for human trafficking and forced labor finding Plaintiff was not harmed or physically restrained and "made a voluntary choice to stay to make a life for herself in the United States.").

In *Garnica v. Edwards*, 72 F.Supp.3d 411 (S.D.N.Y. 2014), a nanny originally from Chile, filed an action against a family alleging forced labor. Plaintiff alleged in her complaint that she was subjected to involuntary servitude, intentionally deprived of medical care and food, prevented from leaving the apartment, isolated, and threatened with harm by the defendants, *inter alia*. *Id.* at 413-16. The court granted defendants summary judgment with respect to plaintiff's § 1589 claim. Plaintiff was "unable to raise a genuine dispute about whether Defendants *intentionally* caused her to fear sufficiently serious physical, psychological, or financial harm to compel someone in her circumstances to continue working." *Id.* at 417 (citation omitted). Plaintiff's testimony contradicted the allegations relating to forced labor. *Id.* at 416. Plaintiff admitted that she regularly left the apartment on her own during which she ran errands, attended church, visited museums, and made friends. *Id.* at 415. Plaintiff also testified that she spoke to her family in Chile daily and continued working for defendants because she hoped their attitude would improve. *Id.* at 416.

*See also Saraswat v. Business Integra, Inc.*, 15-cv-4680, 2019 WL 1865193 at * 11 (E.D.N.Y. April 25, 2019), *aff'd* 799 Fed. Appx. 85 (2d Cir. 2020) (dismissing plaintiff's forced labor claim and holding that there was no threat of deportation as defendants "were simply exercising their contractual rights and their rights under the immigration laws to terminate the H-1B visa that they had sponsored."

In analyzing whether labor was forced under the TVPRA, courts are to "distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (internal quotation marks and citation omitted) (holding plaintiffs did not raise an issue of material fact regarding whether religious order obtained their labor by means of improper conduct and finding plaintiffs "had innumerable opportunities to leave the defendants" but "chose instead to stay with the defendants and to continue providing their ministerial services"). *Id*. at 1180-81.

Here, there is absolutely no evidence that Maryknoll intended to cause Plaintiff to believe that she would suffer serious harm if she did not continue the community living that Plaintiff experienced as a Maryknoll novice and later during her mission work in Panama. There is also no evidence of an intentional threat of serious harm that compelled Plaintiff to remain with Maryknoll when she otherwise would have left. Plaintiff had multiple opportunities to leave the Congregation, including in late 2012 (Tanzania) and in 2014 (Minnesota).

## POINT II

### PLAINTIFF'S DOCUMENT SERVITUDE CLAIMS UNDER 18 U.S.C. 1592 SHOULD BE DISMISSED BECAUSE THE PREDICATE OFFENSE OF FORCED LABOR FAILS AND HER PASSPORT WAS MADE AVAILABLE TO AND IN FACT GIVEN TO HER WHEN SHE REQUESTED IT

Section 1592 of the TVPRA applies to anyone who "knowingly destroys, conceals,

removes, confiscates, or possesses any actual or purported passport" of another:

> (1) in the course of a violation of section …1583 [or] 1589 …
>
> (2) with intent to violate section …1583 [or] 1589 … or
>
> (3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons …

18 U.S.C. § 1592(a).

In *Muchira v. Al Rawaf*, 850 F.3d 605 (4th Cir. 2017), plaintiff (a domestic servant from Kenya) claimed that the Saudi family defendants coerced her into remaining in their employment in the United States by withholding her passport. *Id.* at 623. The Fourth Circuit held that the evidence, particularly plaintiff's deposition testimony, was insufficient for the court to conclude that defendants "'seized' or 'withheld' [plaintiff's] passport as a means of forcing her to remain in a condition of involuntary servitude." *Id.*. Plaintiff admitted that she never asked defendants if she could maintain possession of her passport and defendants never refused her passport. *Id.* Defendants gave plaintiff her passport whenever she needed it. *Id.* at 624. *See also Mallela v. Cogent Infotech Corp.*, No. 2:19-cv-01658, 2020 WL 2541860, at *6 (W.D. Pa. May 19, 2020) (document servitude claim under § 1592 failed since it was predicated on forced labor claim under § 1589, which was dismissed); *United States v. Alstatt*, 858 F. Supp. 2d 1032, 1047 (D. Neb. 2012) (defendants found not guilty of document servitude despite retention of victim's passport because court could not find beyond a reasonable doubt that the defendants intended to commit peonage or forced labor).

Here, Maryknoll kept Plaintiff's passport in the Secretariat office for safekeeping. Plaintiff did not inform Sr. Hockman that she preferred to keep her passport in her bedroom, which did not have a lock or a safe. The record is clear that Plaintiff was given her passport

whenever she needed it – to apply for a social security card, to travel to and from Chicago with other Maryknoll novices, when she traveled home to Tanzania and then to Panama, and when she took a vacation to visit friends in Minnesota in 2014. As a matter of law, Maryknoll is entitled to summary judgment on Plaintiff's document servitude claim.

## POINT III

### THE ENTICEMENT INTO SLAVERY CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF ADMITTED SHE JOINED MARYKNOLL AND CAME TO THE UNITED STATES VOLUNTARILY

15 U.S.C. § 1583 makes it illegal to "entice[ ], persuade[ ], or induce[ ] any other person to go … to any other place with the intent that he or she may be made or held as a slave." 18 U.S.C. § 1583. *See Stein v. World-Wide Plumbing Supply Inc.*, 71 F.Supp.3d 320, 328 (E.D.N.Y. 2014) (holding alleged victim of human trafficking failed to allege that husband's relatives enticed her to move to a different place (Canada) with the intent that she be made a slave, and as a result failed to state a claim under human trafficking statute prohibiting enticement into slavery).

Here, Plaintiff admits that in July 2010 she came to the United States to formally join Maryknoll under her own free will. Plaintiff pursued her religious calling and voluntarily chose to become a Maryknoll Sister. Moreover, the record is clear that Plaintiff asked to be assigned to Maryknoll's Panama mission. Accordingly, Plaintiff's enticement into slavery claims should be dismissed.

## POINT IV

### ALTERNATIVELY, THE FIRST AMENDMENT'S MINISTERIAL EXCEPTION BARS PLAINTIFF'S TVPRA CLAIMS

Courts may not scrutinize many aspects of the minister-church relationship. "The

Religion Clauses of the First Amendment provide that 'Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.'" *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 598 F.3d 668, 671 (9th Cir. 2010) (quoting U.S. Const. Amend. I). "The ministerial exception encompasses all tangible employment actions and disallows lawsuits for damages based on lost or reduced pay." *Id.* at 674 (internal quotation marks omitted). "[A] minister's working conditions … *are* a part of the minister's employment relationship with the church." *Werft v. Desert Southwest Annual Conference of the United Methodist Church*, 377 F.3d 1099, 1103 (9th Cir. 2004).

In *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288 (9th Circuit 2010) the Ninth Circuit affirmed the district court's dismissal of a seminarian's action seeking pay for overtime hours that he worked. The court held that the ministerial exception applied to the claims and stated that:

> First Amendment considerations relevant to an ordained minister apply equally to a person who, though not yet ordained, has entered into a church-recognized seminary program to become a minister and who brings suit concerning employment decisions arising from work as a seminarian.

*Id*. at 1292.

Here, the majority of the conduct on which Plaintiff rests her claims is religiously motivated or otherwise protected under the ministerial exception.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be granted in its entirety and the complaint dismissed with prejudice.

Dated: New York, New York
January 28, 2022

Respectfully Submitted,

CULLEN and DYKMAN LLP
Attorneys for Defendant
Maryknoll Sisters of St. Dominic, Inc.

By: ______________________
Richard A. Coppola, Esq.
RC6624
44 Wall Street, 17th Floor
New York, New York 10005
(212) 510-2250
rcoppola@cullenllp.com