UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
IMMACULATA TEGETE,

                                    Plaintiff,

            - against -

MARYKNOLL SISTERS OF SAINT DOMINIC,
INC.,

                                    Defendant.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 20-CV-5023 (CS)

Appearances:

Christopher R. Mount
Mount Law Group, PLLC
Suffern, New York
*Counsel for Plaintiff*

Richard A. Coppola
Cullen and Dykman LLP
New York, New York
*Counsel for Defendant*

Seibel, J.

        Before the Court is the motion for summary judgment of Defendant Maryknoll Sisters of

Saint Dominic, Inc. ("Maryknoll" or "Defendant").  (ECF No. 48.)  For the following reasons,

the motion is GRANTED.

I.      **BACKGROUND**

        A.      **Facts**

        The following facts, based on Defendant's Local Civil Rule 56.1 Statement, (ECF No. 49

("D's 56.1 Stmt.")), Plaintiff's response thereto, (ECF No. 56 ("P's 56.1 Resp.")), and the

underlying evidence, are undisputed except as noted.  *See Garcia v. Vill. Red Rest. Corp.*, No.

15-CV-6292, 2018 WL 1166723, at *2 n.7 (S.D.N.Y. Feb. 15, 2018) ("[U]nless specifically

controverted, an asserted statement of undisputed fact will be deemed to be admitted for the purposes of the motion.").[1]

Plaintiff Immaculata Tegete ("Plaintiff") was born in Mbinga, Tanzania.  (D's 56.1 Stmt. ¶ 1.)  She was raised in a devout Roman Catholic family; two of her uncles were priests and she attended mass with her family every Sunday.  (*Id.*  ¶¶ 1-3.)  Plaintiff is college educated and also took courses in accounting and administration while residing in Tanzania.  (*Id.* ¶ 4.)  In or about 1996, Plaintiff joined the Benedictine Sisters of Peramiho, Tanzania, whose mission was to provide Catholic teaching services locally.  (*Id.* ¶ 6.)  Plaintiff spent approximately four years as a member of the Benedictine Sisters, ultimately electing in 2000 to leave that religious order because it did not "offer her the international mission experience she desired."  (*Id.* ¶ 9.) Plaintiff was then hired by Bishop Emanuel Mapunda to serve as an administrator of a hospital in Litembo, Tanzania.  (*Id.* ¶ 10.)  Plaintiff later worked with Bishop Mapunda as a secretary and an accounting clerk.  (*Id.* ¶ 11.)  While in Tanzania, Plaintiff lived alone and hired people to assist with domestic tasks such as laundry, cooking, and cleaning, including a "house girl" that cooked for Plaintiff and did her dishes.  (*Id.* ¶¶ 61-62.)

Plaintiff first became aware of Maryknoll – a Catholic order for women that performs international missionary work – in September 2007, after seeing a reference to it in a Catholic directory available in Tanzania.  (*Id.* ¶ 12; *see* ECF No. 57-2 ("P's Depo. 1") at 74:8-75:4); ECF No. 1 ("Compl.") ¶¶ 10, 36.)  Shortly thereafter, Plaintiff initiated contact with Maryknoll by writing to its address in Dar Es Salaam, Tanzania, seeking general information, (D's 56.1 Stmt. ¶ 12), as she was exploring various religious orders to determine "which . . . order [she would] be

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

inspired to join," (*id.* ¶ 13; *see* P's Depo. 1 at 73:24-74:7).  Between September 2007 and June

2008, Plaintiff corresponded with Maryknoll Sister Maureen Meyer, who answered her various

questions and provided her with "Maryknoll Magazines" and other information on Maryknoll.

(D's 56.1 Stmt. ¶ 14.)  In June 2008, Plaintiff met Sister Janet Srebalus, a member of

Maryknoll's Tanzania-based Admissions Team, at the Tanzania Episcopal Conference Hostel.

(*Id.* ¶ 15.)  Sister Srebalus became Plaintiff's primary contact at Maryknoll until 2010.  (*Id.* ¶

16.)

As part of her application for admission to Maryknoll, Plaintiff wrote a formal letter of

application, drafted an autobiography, completed a personal profile form, was interviewed, and

participated in a "Live-In" in a Maryknoll community house in Kalebejo, Tanzania, in order to

"experience life with Maryknoll" firsthand.  (*Id.* ¶ 17.)  In late 2009, Plaintiff was informed that

she would be accepted as a Maryknoll novice.  (*Id.* ¶ 19.)  Maryknoll subsequently assisted

Plaintiff in obtaining a Religious Worker ("R-1") visa from the United States,[2] and in doing so

verified that it would be responsible for Plaintiff's needs while she resided here.  (*Id.* ¶¶ 20-21.)

Plaintiff's R-1 visa was approved in mid-2010 and she flew from Tanzania to New York on July

5, 2010.  (*Id.* ¶¶ 22-23.)  At the time of her entry into the United States, Plaintiff was 37 years

old.  (*Id.* ¶ 23.)  Plaintiff testified during her deposition that she was not forced to come to the

---

[2] "The R-1 visa is a non-immigrant visa created for religious workers to enter the United
States on a temporary basis."  *New Cmty. Corp. v. Barr*, No. 17-CV-10158, 2019 WL 4739154,
at *3 (S.D.N.Y. Sept. 27, 2019).  "To obtain the visa, a religious organization seeking to hire and
sponsor an R-1 applicant petitions the United States Citizenship and Immigration Services
('USCIS')."  *Iglesia Pentecostal Casa De Dios Para Las Naciones, Inc. v. Duke*, 718 F. App'x
646, 647 (10th Cir. 2017).  Federal regulations mandate that when the holder of an R-1 visa "has
been released from or has otherwise terminated employment before the expiration of a period of
authorized R-1 stay, the [holder's] approved employer must notify [the Department of Homeland
Security ("DHS")] within 14 days."  8 C.F.R. § 214.2(r)(14).

United States but instead came of her own free will. (*Id.* ¶ 24; P's Depo. 1 at 160:4-14.)[3]  She

contends, however, that she was enticed to do so by promises that she would engage in

missionary work and receive theological education. (P's 56.1 Resp. ¶ 24.)

In July and August 2010, Plaintiff resided at the Maryknoll Center in Ossining, New

York. (D's 56.1 Stmt. ¶ 26.)  While there, Plaintiff became acclimated to religious life specific

to Maryknoll and familiarized herself with the Congregation. (*Id.* ¶ 27.)  According to

Defendant, during this time, Plaintiff "attended Mass, took English lessons, participated in

vocational gatherings, and had ministry time." (*Id.* ¶ 28.)[4]  Plaintiff alleges that she spent her

time doing menial work caring for elderly nuns. (P's 56.1 Resp. ¶ 28; ECF No. 57-3 ("P's Depo.

2") at 264:2-16.)

During Plaintiff's time in Ossining, her Tanzanian passport (which contained her R-1

visa) was stored in a secure office at Maryknoll for safe keeping. (D's 56.1 Stmt. ¶ 32.)  That

office, which is referred to as the "Secretariat" office, is where all important documents at

Maryknoll are stored. (*Id.* ¶¶ 32-33.)  Plaintiff's room did not have a lock, nor did she have any

place in her room to secure personal documents. (*Id.* ¶ 34.)  While Plaintiff never asked any of

the Maryknoll Sisters where her passport was stored, she knew that Sister Janet Hockman, the

---

[3] In an attempt to dispute this concession, Plaintiff points to additional sections of her deposition testimony and a declaration she submitted in November 2019 to USCIS. (*See* P's 56.1 Resp. ¶ 24; ECF No. 57-1.)  But the evidence to which she points does not dispute that she freely came to this country, it just explains why she chose to come.  Accordingly, Plaintiff "fails to comply with the spirit, if not the letter of [Rule 56.1]" by "speaking past . . . asserted facts without specifically controverting those same facts." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014).

[4] Plaintiff disputes this statement by citing, among other things, her deposition testimony. But those supporting materials do not contradict Defendant's asserted facts; Plaintiff testified that she *did* participate in the activities identified by Defendant, just "[n]ot [as] full[y] as promised" or "not . . . in full," (P's Depo. 1 at 186:2-19), or that she did not remember the activities in which she participated at that time, (*see id.* at 190:17-194:4).

Director of Maryknoll's Admissions Department from 2009 to 2014, (*id.* ¶ 29), was keeping her passport for her and trusted that it would be returned to her, (*id.* ¶¶ 35-36).  Plaintiff had access to her passport whenever she desired it and was given her passport each time she requested it. (*Id.* ¶¶ 38-39.)  Plaintiff never told any Maryknoll Sister that she preferred to keep her passport in her possession, but she did keep other personal documents while at Maryknoll.  (*Id.* ¶¶ 37, 40.)

At some point after Plaintiff arrived in the United States, Sister Hockman accompanied Plaintiff to a social security office in Peekskill, New York.  (*Id.* ¶ 29; P's Depo. 1 at 205:24-206:10.)  On July 20, 2010, Plaintiff was issued a social security card and number, which she needed to register for school and enroll in classes at Catholic Theological Union in Chicago. (D's 56.1 Stmt. ¶ 31.)

On August 8, 2010, Maryknoll formally accepted Plaintiff as a novice candidate.  (*Id.* ¶ 41.)  In the fall of 2010, Plaintiff and another novice traveled to Maryknoll's Orientation House in Chicago to begin their formal orientation to live as Maryknoll Sisters.  (*Id.* ¶¶ 42-43.)  Sisters Teresa Kastner and Shu Chen Wu, the co-directors of Maryknoll's orientation program, returned Plaintiff's passport to her before she traveled to Chicago.  (*Id.* ¶ 44.)  The orientation program at Maryknoll is part of a two-year period known as the "Integration" or "Formation Period," during which a Maryknoll novice assesses whether Maryknoll's form of religious life comports with her expectations.  (*Id.* ¶ 45.)

The orientation program in Chicago in which Plaintiff participated included auditing theological classes at the Catholic Theological Union; participating in a weekly day of prayer and study of Maryknoll's history and constitutions; working at an outreach ministry for the poor; and participating in the daily life of the Maryknoll Sisters' community.  (*Id.* ¶¶ 48-49.)  More generally, Defendant states that during the Formation Period, a novice will ordinarily study

Maryknoll documents, engage in community life, participate in group prayer, study theology and scripture, and engage in some mission work; that Plaintiff was aware, prior to leaving Tanzania, that she would participate in such activities; and that Plaintiff now complains that there was not enough time for personal or communal prayer during her Formation Period.  (*Id.* ¶¶ 46-47.)

Plaintiff disputes Defendant's characterization of both the orientation program and her Formation Period.  She contends that Defendant "engaged in a bait & switch," (P's 56.1 Resp. ¶ 47), the crux of which appears to be that Plaintiff "was made to do laundry, house cleaning, cooking, and eldercare," (*id.* ¶ 60), as well as "shoveling snow" and "gardening," during her two years in New York and Chicago, (*id.* ¶¶ 49-51, 60).  She does not dispute that all Maryknoll Sisters – not just novices like Plaintiff – are required to assist with daily community chores.  (D's 56.1 Stmt. ¶¶ 59, 63.)  Such work reflects the communal living that is central to the "Maryknoll way of life," and the Orientation Program was intended introduce novices to those tasks and that lifestyle.  (*Id.* ¶ 64.)  And Plaintiff testified at her deposition that she was able to perform many of the Formation Period activities that Defendant identified, just "[n]ot [as] full[y] as promised." (P's Depo. 1 at 186:2-4; *see id.* at 185:17-186:23.)  It thus appears that there is no real dispute that Plaintiff did the study, prayer, and mission work that Defendant identifies, and also did the household work that she identifies.  Plaintiff also testified at her deposition that she was not physically threatened or harmed while in Chicago.  (P's Depo. 2 at 294:2-9; *see* D's 56.1 Stmt. ¶ 58.)

On July 1, 2011, Plaintiff signed a Memorandum of Understanding Regarding Maryknoll Sisters Sponsorship for a Nonimmigrant Religious Visa (the "MOU"), a document that all Maryknoll candidates from outside the United States execute during their formation phase.  (D's 56.1 Stmt. ¶¶ 52-53.)  The MOU provided that:  (1) as a Maryknoll candidate, Plaintiff would

conform to all Maryknoll rules as stated in the "Constitutions"; (2) as a non-United States citizen, Plaintiff understood that she was in the United States under Maryknoll's sponsorship; (3) in the event of voluntary withdrawal or dismissal from Maryknoll, the sponsorship would end and Maryknoll would be obligated to report any cessation of sponsorship to the United States government as required by federal regulations; and (4) Plaintiff would need to return to Tanzania if the sponsorship ended.  (*See* D's 56.1 Stmt. ¶ 53; ECF No. 52-2 at 2.)  That same day, Plaintiff also signed an Agreement Regarding Compensation ("ARC"), which provided, in relevant part, that

> all services rendered by [Plaintiff to Maryknoll] . . . shall be given to [Maryknoll] as compensation for lodging of [Plaintiff] and that said lodging shall be the only recompense or consideration for any services or salaries rendered, and . . . in case of dismissal from [Maryknoll], or voluntary withdrawal there from, said [Plaintiff] hereby agrees that she will make no claim of any kind against [Maryknoll] . . . for services or salaries rendered or for any cause or thing whatsoever.

(ECF No. 52-3; *see* D's 56.1 Stmt. ¶ 54.)  All Maryknoll novices sign the ARC.  (D's 56.1 Stmt. ¶ 55.)[5]

---

[5] Plaintiff attempts to dispute Defendant's statements regarding the MOU and ARC, (*see* P's 56.1 Resp. ¶¶ 52-55), claiming that both documents were signed under the "threat of deportation," a threat which is "document[ed]" in the MOU, (*id.* ¶ 53).  As I will explain in Section III.A below, the alleged "threat of deportation" identified by Plaintiff in the MOU is merely a boilerplate recitation of federal regulations governing her R-1 visa.  Plaintiff further claims, with respect to the ARC, "that the elements of a valid contract are not present here (offer, acceptance, consideration, etc)," (*id.* ¶ 54), but she provides no further explanation or reason to doubt the consideration described in that document, or reason to doubt that she willingly signed it because she wanted to be a Maryknoll Sister.  Plaintiff also attempts to dispute Defendant's evidence – namely, Sister Hockman's declaration and Maryknoll's Complementary Document, which outlines the congregation's policies and procedures – that all similarly situated Maryknoll Sisters sign these documents.  (*See* ECF No. 52 ("Hockman Decl.") ¶¶ 11-12; ECF No. 50-16 at 3 ("[A]t the beginning of the Orientation Phase . . . each Sister Candidate . . . signs a legal form whereby she agrees that . . . she will abide by all norms and regulations and that she will claim no remuneration for any services rendered . . . .").)  But her only basis for doing so is that Plaintiff's signed MOU was the only MOU produced in discovery.  (*See* P's 56.1 Resp. ¶¶ 53,

On July 18, 2011, Plaintiff signed her request to make First Temporary Profession as a member of Maryknoll.  (*See* ECF No. 50-17 at 2.)[6]  She voluntarily professed vows of poverty, chastity, and obedience on August 12, 2012, before friends and the Maryknoll congregation. (D's 56.1 Stmt. ¶ 57.)  Throughout this time, Plaintiff was never prevented from communicating with individuals outside Maryknoll; she had access to a laptop and Skyped with friends in Tanzania, and also Skyped with Father Honoratus Mwageni, a Tanzanian priest who served as her mentor and also resided in Chicago at the time.  (*Id.* ¶¶ 67-69.)  Father Mwageni bought Plaintiff a cell phone in 2011, which she could and did use.  (*Id.* ¶ 70.)  Plaintiff also spoke to her family in Tanzania by phone.  (*Id.* ¶ 71.)

After she completed the Formation Period and professed her "First Vows," Plaintiff engaged in a discernment[7] process in anticipation of being given a mission assignment abroad. (*Id.* ¶ 72.)  Defendant alleges that Plaintiff was given three options for her mission location – Panama, Peru, and a location in Asia.  (*Id.* ¶ 73; P's Depo. 2 at 379:10-384:3.)  Plaintiff indicated that she was interested in Panama because it was "a multicultural region," there was "diversity of community living" there, and it provided "a chance for me to [get] involve[d] in the ministries."

---

55.)  That hardly suggests that Plaintiff is the only person who signed these documents, especially because she does not allege that she even requested any others in discovery.  Plaintiff does not dispute the accuracy of the quoted language from either document.  Her attempts to deny Defendant's statements therefore amount to "improper legal argument and unsupported assertions."  *Emanuel v. Griffin*, No. 13-CV-1806, 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015).

[6] Citations to the ECF Nos. 50-15, 50-17, 50-19, 50-25, 50-30, 50-31, and 50-32 refer to page numbers set by the Court's Electronic Case Filing ("ECF") system.

[7] Discernment is defined as a process by which members of the Roman Catholic faith "combine[] reflection, prayer, dialogue, and Scripture" in order to determine "if God is calling [them] to live the religious life as a priest, brother, or sister."  *Discernment Tools*, U.S. Conf. Cath. Bishops, https://www.usccb.org/beliefs-and-teachings/vocations/discernment-tools (last visited Feb. 27, 2023).

(ECF No. 50-19 at 5.)  As part of the preparation for her mission assignment, Plaintiff engaged in scholastic studies and conversations with Maryknoll Sisters from various regions abroad.  (D's 56.1 Stmt. ¶¶ 75-76.)  Plaintiff was ultimately assigned Panama as her mission location on October 10, 2012.  (*Id.* ¶ 75.)  Maryknoll maintains that Plaintiff requested that she be assigned to Panama, (*see id.* ¶¶ 73-75), and Plaintiff disputes that categorization, claiming that she "was not given a choice" as to where her mission assignment would take place, (*see* P's 56.1 Resp. ¶¶ 73-75; P's Depo. 2 at 379:24-381:19).  But Plaintiff also testified at her deposition that she did not object to her initial assignment to Panama.  (P's Depo. 2 at 381:20-24.)

Plaintiff traveled back to Tanzania on November 15, 2012, before traveling to Panama to begin her mission assignment.  (D's 56.1 Stmt. ¶ 77.)  Maryknoll contends that all Sisters take such a trip home to visit their families after making their First Vows and prior to embarking on their first mission assignment.  (*Id.* ¶ 78.)  Plaintiff purports to dispute that assertion on the grounds that the trip was necessary because her I-94 visa[8] had expired.  (*See* P's 56.1 Resp. ¶¶ 77-78.)  Plaintiff testified at her deposition, however, that she returned to Tanzania at Maryknoll's "request[] . . . before [going] to my assignment mission country."  (P's Depo. 2 at 347:7-10.)  Plaintiff also testified that it was her R-1 visa, not her I-94 visa, that expired, and did not testify that her R-1 visa's expiration was the cause of her trip to Tanzania.  (*Id.* at 348:17-349:5.)  Plaintiff testified that while in Tanzania, she spent time with her family to "just enjoy life together after being away from some years" and that she saw all her immediate family while

---

[8] "Form I-94 is the DHS arrival/departure record issued to aliens who are admitted to the U.S., who are adjusting status while in the U.S. or extending their stay, among other uses.  A CBP officer generally attaches the I-94 to the non-immigrant visitor's passport upon U.S. entry.  The visitor must exit the U.S. on or before the departure date stamped on the I-94."  *Lotero-Diaz v. U.S. Dep't of Homeland Sec.*, 20-CV-23039, 2020 WL 7641056, at *1 n.3 (S.D. Fla. Dec. 23, 2020).

there.  (*Id.* at 360:14-361:6.)  This testimony appears to concede the fact that at least one purpose of Plaintiff's November 2012 trip to Tanzania was to visit her family.

Maryknoll provided Plaintiff with her passport prior to her departure to Tanzania, and no one at Maryknoll forced her to depart Tanzania for Panama when she did so in April 2014.  (D's 56.1 Stmt. ¶ 79; P's Depo. 2 at 387:12-20.)  Plaintiff retained possession of her passport while in Panama.  (D's 56.1 Stmt. ¶ 80.)  Plaintiff knew and agreed that her mission assignment in Panama was intended to last three to five years.  (*Id.* ¶ 81.)  Maryknoll maintains that while in Panama, Plaintiff completed an intensive Spanish-language program in Panama City, volunteered at a halfway home for children with terminal cancer, and worked with other Maryknoll sisters who were volunteering in the parish of Las Mananitas.  (*Id.* ¶ 83.)  Plaintiff partially disputes this description of her activities while in Panama – she contends that she also "ended up doing farm work, cooking, cleaning and other forms of manual labor" and that she was "required . . . to stop attending the church in Las Mananitas."  (P's 56.1 Resp. ¶ 83.)

Plaintiff later identified issues with her living situation in Panama that affected her health. (D's 56.1 Stmt. ¶ 85; *see* P's Depo. 2 at 398:7-24, 403:2-404:16.)  Specifically:  (1) Plaintiff lived with a smoker during her period of language study and the cigarette smoke affected her ability to breathe; and (2) Plaintiff subsequently resided with Maryknoll Sisters in accommodations that included dogs and cats kept as pets, to which she experienced a strong allergic reaction.  (D's 56.1 Stmt. ¶ 86; *see* P's Depo. 2 at 398:7-24; 403:2-404:16; ECF No. 50-25 at 6-7.)[9]  During that time, Plaintiff corresponded with Maryknoll Sister Euphrasia Nyaki,

---

[9] Plaintiff attempts to deny and/or dispute this representation of the living conditions in Panama with which she was unhappy, but she again improperly interjects immaterial facts and argument in response to the assertion made by Defendant.  (*See* P's 56.1 Resp. ¶ 86 ("Plaintiff *was also* unhappy with yet another bait and switch doing farm work, cooking, cleaning, and

who was also originally from Tanzania.  (D's 56.1 Stmt. ¶ 87.)  Sister Nyaki advised Plaintiff to "try to find ways to be patient for the time being," as the issues Plaintiff was experiencing represented "[c]ommunity living challenges [which] for Maryknoll Sisters are many" and stated that "Maryknoll life, especially community life, isn't easy."  (ECF No. 50-25 at 12.)

Plaintiff had free use of her laptop while in Panama and she remained in communication with Father Mwageni via Skype at that time.  (D's 56.1 Stmt. ¶ 89.)  Plaintiff also had a cell phone while in Panama.  (*Id.* ¶ 90.)  Plaintiff's friends Jean Enneking and Katie Sullivan visited her in Panama; together the women toured the Panama Canal and attended mass.  (*Id.* ¶¶ 91-92.)  Enneking testified that while in Panama with Plaintiff, she observed her "serving as a missionary" and performing various forms of volunteer work.  (ECF No. 50-9 at 46:9-47:16.)  Plaintiff testified that she was never physically threatened by anyone at Maryknoll while she was in Panama. (D's 56.1 Stmt. ¶ 88; P's Depo. 2 at 427:20-23.)  And Plaintiff received medical care for fibroids and allergies while in Panama.  (D's 56.1 Stmt. ¶ 94.)[10]

On August 25, 2014, at Maryknoll's invitation, Plaintiff flew from Panama to New York, using her passport, and attended Maryknoll's General Assembly as an official participant.  (*Id.* ¶

---

other forms of manual labor while in Panama as opposed to doing mission work." (emphasis added).)  Accordingly, Defendant's assertion as to Plaintiff's dissatisfaction with the smoking and pets is deemed admitted for the purposes of this motion.

[10] It is undisputed that "Maryknoll's Congregational Policies provide that each Maryknoll Sister is responsible for maintaining her own health."  (D's 56.1 Stmt. ¶ 119.)  Defendant also maintains that Plaintiff received "medical care and necessary medical treatment while she was with Maryknoll in New York, Chicago, and Panama," (*id.* ¶120), including treatment for uterine fibroids and excessive bleeding, dental work, and treatment "for an infection in her leg," all at Defendant's expense.  (*Id.* ¶¶ 121-124.)  Plaintiff disputes some of these assertions and contends that "Defendant on numerous occasions failed to provide medical care and necessary medical treatment to Plaintiff."  (P's 56.1 Resp. ¶ 120.)  But Plaintiff does not dispute the statement that "Maryknoll paid for all of Plaintiff's medical procedures and treatments wherever she was in the world," (D's 56.1 Stmt. ¶ 124), and neither Plaintiff nor Defendant addresses Plaintiff's medical treatment – or lack thereof – in their briefs.

95.)  After the conference, Plaintiff took a two-week vacation to visit friends in Minnesota.  (*Id.* ¶ 98).  Plaintiff had her passport and visa with her when she traveled from New York to Minnesota.  (*Id.* ¶ 99.)  After that vacation, Plaintiff returned to the Maryknoll residence in Westchester County, New York.  (*Id.* ¶ 105.)  Throughout that time, Plaintiff remained in contact with her friend Enneking via email and her mentor Father Mwageni via Skype.  (*Id.* ¶ 101).

While in New York, one of the Maryknoll Sisters drove Plaintiff to the New York State Department of Motor Vehicles in Peekskill, where Plaintiff was issued a New York State driver's license after presenting her passport and social security card.  (*Id.* ¶¶ 102-103.) Plaintiff's New York State driver's license replaced the Illinois driver's license that she had obtained while in Chicago during her Maryknoll orientation.  (*Id.* ¶ 104.)

Around the same time, Sister Bernice Rigney, the co-director of Maryknoll's Personnel Department, asked Plaintiff to return to Panama to continue her mission phase.  (*Id.* ¶ 106.)  In response, Plaintiff asked Maryknoll leadership to be assigned to a different mission location.  (*Id.* ¶ 107.)  Maryknoll then asked Plaintiff to continue in Panama because she had not spent enough time there to make such a decision, and Plaintiff requested more time for discernment in New York.  (*Id.* ¶ 108.)  Sister Rebecca Macugay, Maryknoll's Vice President, also met with Plaintiff at the Maryknoll residence and asked that she continue her discernment in Panama, because that was her mission assignment.  (*Id.* ¶¶ 109-110.)

Plaintiff confided in certain Maryknoll Sisters – including Sister Elizabeth Terbrock – and described her unfulfilled expectations, which Sister Terbrock helped her incorporate into an email to Sister Gerri Brake, a Personnel Coordinator for Maryknoll's Panama Mission.  (*Id.* ¶¶ 111-112.)  That email stated, among other things:

> I would like to communicate directly to you the reason that I cannot think of returning to Panama at this time.  My reason is only that I have experienced

strong allergic reactions to the animals – dogs, cats – that are allowed to live and roam freely throughout all three of the local community houses in the Panama region.  It is not a matter of problems with anything else.  My allergic reactions were severe, and I felt physically overwhelmed – by the allergies themselves and by the medication prescribed by the doctor.  I did not feel anyone was taking my allergic reactions seriously, and I felt that I was being judged as unfit for mission because of all this.  I have perceived that the Panama region is not willing to adapt their lifestyle to accommodate to my physical needs.  This is why I do not feel I can return to Panama at this time.

At this moment I am planning to meet with the Congregational Leadership Team in order to explain my reasons for not returning to Panama, and to ask if they can offer me any other possibilities/options for my Mission Phase.

(ECF No. 50-30 at 3.)  Plaintiff sent that email to Sister Brake, who responded on November 8, 2014.  (D's 56.1 Stmt. ¶ 114.)  In her response, Sister Brake noted that Maryknoll had tried to respond to Plaintiff's concerns as well as it could, given that there was "nothing on [Plaintiff's] medical record . . . indicating any allergies whatsoever"; that Plaintiff had not followed up on suggestions that she seek medical evaluations, including that she get tested to find out to what antibiotics she is allergic for future reference; and that all the houses in Panama had made adjustments to address Plaintiff's expressed allergies, including not allowing pets to stay indoors overnight.  (ECF No. 50-31 at 2.)  Sister Brake further stated that Maryknoll Sisters in Panama "have made some adjustments and apologize if they were insufficient" and that Maryknoll was "willing to make more adjustments in consideration of [Plaintiff's] health," including "hav[ing] an allergist to attend to [Plaintiff]."  (*Id.* at 3.)

On December 1, 2014, Maryknoll leadership sent Plaintiff a letter requesting that she return to Panama to continue her mission phase and outlining several steps recommended to the Panama Mission Sisters to further accommodate Plaintiff.  (D's 56.1 Stmt. ¶ 116.)  Those additional accommodations included:  (1) scheduling "an immediate appointment with an Allergist" in order to "determine the cause of your allergy-like symptoms . . . and have a correct accurate prescription for medication needed"; removing the two dogs in the Las Mananitas

household while Plaintiff's health was assessed; initiating a "serious, deep and mindful conversation" about the "enjoyment and companionship that pets give" and "the impact of keeping pets on health and relationships in a community"; encouraging regular reflection and community meetings with Sisters in their mission phase to ensure that they "are mentored and have access to Spiritual Direction"; and understanding Plaintiff's mission plan "to support her implementation in full ministry [and] to give needed and helpful feedback." (ECF No. 50-32 at 3.)[11]

Plaintiff ultimately decided not to return to Panama. (D's 56.1 Stmt. ¶ 118.) As a result, Maryknoll released Plaintiff from her vows on December 12, 2014. (*Id.* ¶ 125.) Maryknoll also purchased a plane ticket to Tanzania for Plaintiff and provided her with $700 and copies of her birth certificate and baptismal certificate. (*Id.* ¶ 126.)

Plaintiff's acceptance of the cash and the ticket was documented in a "Declaration of Acceptance of an Indult of Departure for a Sister in Temporary Profession" (the "Indult"), which she signed on December 15, 2014. (ECF No. 50-15.) The Indult provided that: (1) Plaintiff accepted release from membership in Maryknoll and would be "free[] . . . from the obligation of the vows and the rights and duties assumed at [Maryknoll]"; (2) Plaintiff would withdraw from residence with members of Maryknoll; and (3) Plaintiff had "no right to any remuneration of the religious congregation and corporation of . . . Maryknoll." (*Id.* at 2.)

---

[11] Plaintiff does not attempt to refute the fact that these accommodations were offered by Defendant. Instead, Plaintiff asserts that "[i]t is hard to imagine how this would be enough to reassure Plaintiff when the leadership team refused to meet with Plaintiff, refused to address the bait and switch scheme of promising missional work and assigning house cleaning, farming, etc." (P's 56.1 Resp. ¶ 117.) Plaintiff does not explain why, having told Defendant that her only issue with returning to Panama was her allergies, Defendant would have been expected to engage with her regarding manual labor. In any event, it is improper to include such argument in a Rule 56.1 response. *See Pearlstein v. BlackBerry Ltd.*, No. 13-CV-7060, 2022 WL 19792, at *8 (S.D.N.Y. Jan. 3, 2022) (collecting cases).

Around or about that same time, Maryknoll offered Plaintiff $5,000 upon her return to Tanzania to assist with her re-integration into Tanzanian life.  (D's 56.1 Stmt. ¶ 128.)  That money was to be provided to Plaintiff in Tanzania, through the Maryknoll Sisters Tanzania Region.  (*Id.* ¶ 130).  Plaintiff, however, did not use the return ticket to Tanzania provided by Maryknoll, and instead remained in the United States where she wished to reside.  (*Id.* ¶ 127.)  Although she did not return to Tanzania, Plaintiff sent an email to Maryknoll requesting the $5,000 and ultimately received it on March 21, 2015.  (*Id.* ¶ 132.)  As of the date of Defendant's 56.1 Statement, Plaintiff resides in the United States.  (*Id.*)

**B.    Procedural History**

Plaintiff initiated this action on July 2, 2020, alleging that Defendant violated the provisions of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1581 *et seq.*, prohibiting enticement into slavery, forced labor, and document servitude. (*See* Compl.)  Defendant timely answered on October 19, 2020.  (ECF No. 22.)

On November 16, 2021, after discovery, Defendant filed a pre-motion letter in anticipation of a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 39.)  Plaintiff responded, (ECF No. 40), and the Court held a pre-motion conference on November 30, 2021 at which I set a briefing schedule.  (*See* Minute Entry dated Nov. 30, 2021.)  The instant motion followed.  (ECF No. 48.)

**II.    LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423,

428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where a

declaration is used to support or oppose the motion, it "must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the . . . declarant is competent to

testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino,*

*Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

Finally, in "'the rare circumstance where the Plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the Plaintiff and thus whether there are any genuine issues of material fact, without making some assessment of the Plaintiff's account.'"  *Garnica v. Edwards*, 72 F. Supp. 3d 411, 413 (S.D.N.Y. 2014) (quoting *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005)).  "Therefore, in order to determine whether there [a]re any genuine issues of material fact to be tried by a jury, [a] District Court [i]s entitled to assess [a plaintiff's] factual averments" in such circumstances.  *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011); *see Garnica*, 72 F. Supp. 3d at 413.

## III.   <u>DISCUSSION</u>

Defendant seeks summary judgment on all of Plaintiff's claims under the TVPRA, which fall into three categories:  (1) claims that her labor and services were obtained through actual or threatened force, physical restraints, or "serious harm" to herself, in violation of 18 U.S.C. § 1589; (2) claims that she was enticed, persuaded, and induced to travel to the United States with the intent that she be made and held as a slave, in violation of 18 U.S.C. § 1583; and (3) claims that her passport and all other identifying documentation were knowingly confiscated to prevent her escape and restrict her movement, in violation of 18 U.S.C. § 1592.  (*See generally* Compl.; ECF No. 55.)

A.    **18 U.S.C. § 1589 Forced Labor Claims**

Plaintiff's first claim for relief alleges a violation of 18 U.S.C. § 1589, which imposes liability on anyone who "knowingly . . . obtains the labor or services of a person" by means of (1) "force, threats of force, physical restraint, or threats of physical restraint to that person or another person"; (2) "serious harm or threats of serious harm to that person or another person"; (3) "abuse or threatened abuse of law or legal process"; or (4) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a)(1)-(4).  The "serious harm" contemplated by the TVPRA includes "psychological, financial, or reputational harm."  *Id.* § 1589(c)(2).

In order to establish a violation of § 1589, a plaintiff must first show that the threat of harm was sufficiently serious and, second, that the defendant had the requisite scienter, *i.e.*, "that the employer intended to cause the victim to believe that she would suffer serious harm . . . if she did not continue to work."  *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).  Accordingly, "[t]he linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her."  *Id.*

> Typically . . . forced labor situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent vulnerable victims from leaving and to keep them bound to their captors.

*Muchira v. Al Rawaf*, 850 F.3d 605, 618-19 (4th Cir. 2017).  Here, Plaintiff has failed to present any evidence from which a reasonable trier of fact could conclude that she was subject to such

circumstances, or that Defendant intended to exploit any such circumstances to prevent Plaintiff

from leaving and ensure that she kept working.

Plaintiff maintains that she was assigned "to all manner of manual labor in New York,

Chicago, and Panama in a massive four-year bait and switch," and that such labor was obtained

by "threats of deportation and financial ruin," which Maryknoll "clearly intended [her] to

receive." (ECF No. 58 ("P's Opp.") at 8.) Plaintiff contends that these threats were reflected in

the MOU and ARC that she signed; that "Maryknoll knew full well that [Plaintiff] gave up her

whole prior life and all of her money and assets prior to joining and was fully dependent upon

them"; and that she "had to continue to work for Maryknoll or else she would be deported back

to Tanzania and could possibly end up destitute due [to] the inability to find employment." (*Id.*

at 9.)

But such allegations are insufficient as a matter of law to establish that once in the United

States, Plaintiff was made to provide her labor and services through threats of serious harm. As

an initial matter, Plaintiff was "not an especially vulnerable victim," as "[s]he was not young,

inexperienced, or brought to this country illegally." *Muchira*, 850 F.3d at 620. Indeed, she

testified that she was an educated professional who legally came to the United States of her own

free will when she was 37 years old. (P's Depo. 1 at 160:4-14; *see* D's 56.1 Stmt. ¶¶ 4, 23.)

Plaintiff also conceded at her deposition that she was not physically mistreated, harmed, or

explicitly threatened with physical harm in any way, either before or after arriving in the United

States. (*See* P's Depo. 2 at 247:2-17, 293:20-294:9, 427:20-23.) And Plaintiff does not claim

that she was physically restrained or lacked the physical ability or means to leave Maryknoll at

any time while in the United States. To the contrary, Plaintiff testified that was regularly able to

travel unaccompanied, both domestically and abroad, including a trip to Tanzania to visit with

family and a two-week vacation to Minnesota to visit friends.  (*See* P's Depo. 2 at 326:22-327:11, 360:14-361:6; D's 56.1 Stmt. ¶ 98.)  As such, Plaintiff's deposition testimony and other undisputed facts "conclusively rule out a claim predicated on actual force, harm, or physical restraint."  *Velez v. Sanchez*, 754 F. Supp. 2d 488, 498 (E.D.N.Y. 2010) *aff'd in relevant part*, 693 F.3d 308 (2d Cir. 2012).

Plaintiff similarly cannot establish "the type of extreme isolation that would have led a reasonable person in [her] situation to believe that she was psychologically imprisoned in a forced-labor situation."  *Muchira*, 850 F.3d at 621.  Indeed, Plaintiff testified that "[s]he had virtually unfettered access to a private cell phone and to the Internet," including the use of a laptop, and that "she had substantial opportunity to use these forms of communication in the privacy of her living quarters."  *Id.*; (*see* P's Depo. 2 at 271:12-273:22 (testifying that she had access to a laptop and Skype when she arrived in New York, and that she used Skype in her bedroom); *id.* at 299:21-300:12 (testifying that she used Skype to communicate with Father Mwageni while in Chicago); *id.* at 300:10-301:8 (testifying that she had access to a personal cell phone that she used to call her family); *id.* at 436:4-437:13 (testifying that she used email and Skype on a personal laptop to communicate with others while in Panama); *id* at 457:5-15 (testifying that she used email to send personal messages to Enneking).)  And, as discussed, Plaintiff was able to travel unaccompanied to visit family in Tanzania and took a two-week vacation to visit Enneking in Minnesota.  (*See* P's Depo. 2 at 326:22-327:11, 360:14-361:6, 439:3-442:4; D's 56.1 Stmt. ¶ 98.)  Moreover, Enneking and another friend visited Plaintiff while she was abroad in Panama, where they all traveled together and visited the Panama Canal. (D's 56.1 Stmt. ¶¶ 91-93.)  Such freedom of communication and movement belies the notion that Plaintiff felt so psychologically imprisoned that she was unable to terminate her employment and

walk away.  *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012)

(rejecting § 1589 claim in part because plaintiffs had access to phones and the Internet and were

able to travel to visit family and friends).

Plaintiff also cannot establish that she was subject to serious harm in the form of "abuse

or threatened abuse of law or legal process."  18 U.S.C. § 1589(a)(3).  Plaintiff contends that the

MOU she signed represents a documented "threat of deportation."  (P's Opp. at 9.)  But the

language that Plaintiff points to in the MOU, (ECF No. 52-2), simply recites the substance of

federal regulations which mandate that when the holder of an R-1 visa "has been released from

or has otherwise terminated employment before the expiration of a period of authorized R-1 stay,

the [holder's] approved employer must notify DHS within 14 days."  8 C.F.R. § 214.2(r)(14).  As

such, the MOU at most reflects "an accurate statement of what could happen to Plaintiff if [s]he

did not perform [her] obligations . . . [and] if [Maryknoll], as the sponsor of Plaintiff's . . . visa,

then terminated it."  *Saraswat v. Bus. Integra, Inc.*, No. 15-CV-4680, 2019 WL 1865193, at *9

(E.D.N.Y. Apr. 25, 2019).  Thus, Plaintiff's claim that Defendant "h[ad] her sign a document

stating that she would be deported if she was dismissed from Maryknoll or left," (P's Opp. at 9),

fails to constitute an actionable legal threat as contemplated by the TVPRA.  *See Headley*, 687

F.3d at 1180 ("In applying the [TVPRA], we must distinguish between []improper threats or

coercion and permissible warnings of adverse but legitimate consequences.  This case involves

the latter.  A church is entitled to stop associating with someone who abandons it"); *Pasamba v.

HCCA Int'l, Inc.*, No. CV-08-247, 2008 WL 2562928, at *6 (D. Ariz. June 24, 2008) ("warning

of adverse but legitimate consequences to terminating her employment prematurely would not constitute abuse of process").[12]

Finally, Plaintiff claims that she feared dire economic consequences or hardships, *i.e.*, financial harm, should she terminate her relationship with Maryknoll and return to Tanzania. (*See* P's Opp. at 9.) But her "evidence in support of [that fear] consists of little more than conclusory and speculative allegations that fall far short of establishing that this fear was reasonable or that [Defendant] intended to instill any such fear." *Muchira*, 850 F.3d at 623. Indeed, Plaintiff was an educated professional who had a good job and a comfortable lifestyle in Tanzania, and she presents no evidence from which a reasonable jury could conclude that in the years she was associated with Maryknoll, her standing or prospects in Tanzania somehow evaporated.

Moreover, even if Plaintiff for some reason subjectively believed that she would be destitute if she returned to Tanzania, she has offered no plausible allegations as to why Defendant would share that view or, indeed, any evidence at all that Defendant had the intent that § 1589 requires. *See Dann*, 652 F.3d at 1170 ("[T]he scope of the statute is narrowed by the requirement of scienter. The jury must find that the employer *intended* to cause the victim to believe that she would suffer serious harm . . . if she did not continue to work." (emphasis added)). Instead, Plaintiff repeats conclusory allegations that Defendant "clearly intended [Plaintiff] to receive . . . threats," (P's Opp. at 8-9), and that "[t]he threats were obviously intentional," (*id.* at 10). Such conclusory allegations – unsubstantiated by any other evidence in

---

[12] To the extent that Plaintiff's pleadings can be read to allege that Defendant made verbal statements concerning deportation mirroring the language of the MOU, those allegations likewise reflect "permissible warnings of adverse but legitimate consequences" and are not actionable pursuant to § 1589. *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 10-CV-1341, 2012 WL 748760, at *7 (E.D.N.Y. Mar. 7, 2012).

the record – are insufficient to defeat summary judgment.  *See Simpri v. City of N.Y.*, No. 00-CV-6712, 2003 WL 23095554, at * 3 (S.D.N.Y. Dec. 29, 2003) ("[E]ven where an employer's intent is at issue, a plaintiff must provide more than conclusory allegations. . . to defeat a motion for summary judgment.").

Moreover, "Plaintiff's testimony contradicts virtually all the serious allegations in her [papers]" on the subject.  *Garnica*, 72 F. Supp. 3d at 416.  As to financial harm, Plaintiff's Complaint alleges that Defendant "believed that [Plaintiff] would be destitute if she returned to Tanzania expelled from the organization and used that fear to oppress [Plaintiff] into servitude," (Compl. ¶ 117), and her Opposition similarly alleges that she "had to continue to work for Maryknoll or else she would be deported back to Tanzania and could possibly end up destitute," (P's Opp. at 9).  Not only does the record contain no evidence supporting these propositions, but at her deposition, Plaintiff testified that while she believed that she would "have . . . nowhere to start [her] life" if she were to return to Tanzania, she did not know if Defendant "had that same understanding."  (P's Depo. 2 at 324:21-325:21.)  And immediately thereafter, when asked whether Defendant "intended for [her] to suffer financial ruin and loss of reputation," she responded, "I don't know."  (*Id.* at 325:17-21.)

In that same vein, Plaintiff testified that she remained in Defendant's employ not because she felt forced to provide her labor, but because she herself wanted to continue pursuing her call to service, *i.e.*, her vocation, and hoped that her situation would improve.  Specifically, she explained that:

- She was "not asking not to be a part of [Maryknoll]" when she raised concerns about the housework with which she was tasked, but instead was "just communicating the different assignments [she was getting]" and that she "did not see that [those assignments were] enough reason for [her] to give up [her] vocation," (*id.* at 292:4-293:5);

- "The desire of responding to [her] call was much stronger than [the] difficulties [she] faced when [she] was with Maryknoll in New York and in Chicago," and therefore she "decide[d] . . . to give more chance" in the hopes that "by changing location[s] [to Panama], [she] would be able to do what God wants [her] to do, through Maryknoll," (*id.* at 389:10-390:6); and

- She "still hoped that by changing – going to Panama, [she] would not be going through the same difficulties that [she] had in Chicago and New York," and therefore she "preferred to give another chance so that [she] just don't cut off [her] vocation or [her] call," (*id.* at 391:6-17).

Moreover, Plaintiff testified that she traveled from Panama to the United States in 2014 in part because she wanted to meet with members of the Maryknoll leadership team in person and communicate her concerns as to continuing her Panama mission, in light of the unexpected difficulties she experienced there. (*id.* at 445:12-25.)  In other words, Plaintiff recognized that it was simply "not working out with Maryknoll." (*Id.* at 390:13-17.)  And once it became clear that Defendant was unwilling or unable to accommodate Plaintiff by changing her mission location to a different country, Plaintiff decided not to return to Panama and opted to leave Defendant's employ, while remaining in the United States. (*Id.* at 464:23-465:25, 486:24-488:10; *see* D's 56.1 Stmt. ¶¶ 110, 118, 127, 132.)  Plaintiff does not dispute that after she made that decision, Defendant did not attempt to force her to return to Panama but instead released her from her vows and provided her with over $5,000 and a plane ticket to Tanzania. (D's 56.1 Stmt. ¶¶ 125-132.)  Accordingly, Plaintiff's own testimony concedes – and other undisputed facts confirm – that she chose to stay with Defendant until Maryknoll refused her request not to return to Panama, and that she "successfully left . . . the first time [she] tried to do so," *Headley*, 687 F.3d at 1177.  She simply "is unable to raise a genuine dispute about whether Defendant[] intentionally caused her to fear sufficiently serious physical, psychological, or financial harm to compel someone in her circumstances to continue working." *Garnica*, 72 F. Supp. 3d at 417.

At bottom, "not all bad employer-employee relationships will constitute forced labor,"

*Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 978 (W.D. Mo. 2014), and an

employer will only be "guilty of forced labor if [it] intends to cause a person in [its] employ to

believe that if she does not continue to work, she will suffer the type of serious harm . . . that

would compel someone in her circumstances to continue working to avoid that harm," *Dann*, 652

F.3d at 1169-70.  Here, viewing all the evidence in the light most favorable to Plaintiff and

drawing all reasonable inferences in her favor, no reasonable trier of fact could find that

Defendant threatened her with sufficiently "serious harm" as defined by the TVPRA, or that

Defendant intended for Plaintiff to believe that any such serious harm would befall her, in order

to obtain Plaintiff's labor.  Accordingly, summary judgment is GRANTED to Defendant on

Plaintiff's § 1589 forced labor claim.

### B.      18 U.S.C. § 1583 Enticement into Slavery Claims

Plaintiff's second claim for relief alleges a violation of 18 U.S.C. § 1583, which imposes

liability on anyone who "entices, persuades, or induces any other person to go . . . to any other

place with the intent that he or she may be made or held as a slave."  18 U.S.C. § 1583(a)(2).

The TVPRA does not define the terms "entice," "persuade," or "induce."  Where a term

is undefined in a statute, courts will "normally construe it in accord with its ordinary or natural

meaning."  *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012).  "In this regard, the use of the

term 'entice' in the TVP[R]A means that the perpetrator attracts the victim by offering

something that arouses hope or desire."  *Ardolf v. Weber*, 332 F.R.D. 467, 474 (S.D.N.Y. 2019).

The generally accepted definition of "slave" under § 1583 is "a person who is wholly subject to

the will of another, one who has no freedom of action and whose person and services are wholly

under the control of another, and who is in a state of compulsory service to another."  *United*

*States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981). Such control "usually includes both elements of physical restraint and complete psychological domination." *Turner v. Unification Church*, 473 F. Supp. 367, 375 (D.R.I. 1978); *see McGarry v. Pallito*, 687 F.3d 505, 511 (2d Cir. 2012) (explaining that a similar section of the TVPRA, § 1584, which prohibits involuntary servitude, is violated by the creation of "a condition of servitude in which the victim is forced to work for the defendant by the use of threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process.").

Plaintiff maintains that Defendant "clearly enticed [her] to come to the United States" and "made promises to [her] that she would be given the opportunity to pursue theological education and engage in missionary work by joining . . . Maryknoll"; and that Defendant's "intent for [Plaintiff] can be deduced from their use of her when she arrived," including by having her perform "eldercare and cleaning services for two years as opposed to missionary work," and having her perform "farm work and cooking in Panama for two years instead of missionary work." (P's Opp. at 7.) Plaintiff further contends that "Maryknoll intended to obtain [her] labor since they did in fact obtain it" and that Defendant used "[t]he threat of deportation and financial ruin" to do so. (*Id.* at 7-8.)

When viewed in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant's promises of theological education and missionary work were made to entice Plaintiff into traveling to the United States and joining its religious order, even though Plaintiff does not allege that she was promised only such employment and does not deny that she engaged in some education and missionary work. But even assuming the alleged "bait and switch" was significant enough to amount to enticement, the plain language of § 1583 shows that enticement alone is insufficient for liability. *See generally* 18 U.S.C. § 1583. Instead, Plaintiff must show

that Defendant enticed her with the intent that she be held as a slave, which she fails to do as a matter of law.  *See id.*

Cases interpreting § 1583 and its sister provision § 1584 – which prohibits involuntary servitude – are few.  *See Manliguez v. Joseph*, 226 F. Supp. 2d 377, 384 (E.D.N.Y. 2002) ("[T]he lack of case law addressing . . . a private right of action for involuntary servitude is not surprising – instances of involuntary servitude are rarely found in modern American society."). That said, courts assessing claims concerning § 1583's prohibition against slavery and § 1584's similar prohibition against involuntary servitude make clear that circumstances running afoul of those provisions are typically "limited to labor camps, isolated religious sects, or forced confinement."  *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 540 (3d Cir. 2012).  In that vein, the Fourth Circuit held that defendants operating a migrant labor camp violated § 1583 where: (1) workers "were forbidden to leave the camp until they had satisfied any debts allegedly owed [to defendant]"; (2) defendant "repeatedly threatened workers at the camp with serious injury or death if they attempted to leave without paying their debts"; (3) defendant "backed up his threats with severe beatings and assaults with firearms, administered personally or by his lieutenants," which created a "climate of fear"; and (4) when workers left the camp, defendants "threatened them, beat them severely, forced them into [a] van and returned them to the camp."  *Booker*, 655 F.2d at 562-66; *see United States v. King*, 840 F.2d 1276, 1280-81 (6th Cir. 1988) (religious sect violated § 1584 where they "repeatedly used and threatened to use physical force to make the children [at their camp] perform labor and . . . the children believed they had no viable alternative but to perform such labor," particularly given the "severity, frequency, and widespread nature of the beatings," which created a "pervasive climate of fear . . . among the children.").

Plaintiff has simply alleged no such physical harms – threatened or actual – intended to hold her as a slave, *i.e.*, to hold her "wholly subject to the will of [Defendant]" with "no freedom of action." *Booker*, 655 F.2d at 566.  To the contrary, Plaintiff repeatedly testified at her deposition that Defendant never physically harmed or threatened her at any time.  (*See* P's Depo. 2 at 247:2-17, 293:20-294:9, 427:20-23.)  And, as discussed in Section III.A above, Plaintiff was not physically restrained or isolated.  Instead, she testified as to her extensive freedom of movement and ability to communicate with others both domestically and abroad via Skype, email, and cellphone.  (*See* P's Depo. 2 at 271:12-273:22, 299:21-301:8, 326:22-327:11, 360:14-361:6, 436:4-437:13, 439:3-442:4, 457:5-15.)

Similarly, the only legal threat that Plaintiff identifies is the threat of deportation.  (P's Opp. at 7-8.)  As a threshold matter, as discussed, Plaintiff has failed to allege an actionable threat of deportation, as opposed to simply being advised of requirements of U.S. immigration law.  (*See* Section III.A above.)  But even if Plaintiff had alleged an actionable threat, courts in this Circuit have held that the threat of deportation, standing alone, does not rise to the level of coercion necessary to create the slavery-like conditions prohibited by the TVPRA.  *See, e.g.*, *Walia v. Veritas Helathcare Sols. L.L.C.*, No. 13-CV-6935, 2015 WL 4743542, at *4, *4 n.10 (S.D.N.Y. Aug. 11, 2015) (threats to terminate visa do not rise to level of coercion necessary to state claim for involuntary servitude pursuant to § 1584, absent other serious allegations such as being "forced to work under threat of death"); *Baiju v. U.S. Dep't of Labor*, No. 12-CV-5610, 2014 WL 349295, at *18 (E.D.N.Y. Jan. 31, 2014) ("[T]hreats of deportation do not constitute holding an employee in involuntary servitude under 18 U.S.C. § 1584."); *Winthal v. Mendez*, No. 76-CV-3161, 1978 WL 14035, at *3 (S.D.N.Y. Apr. 18, 1978) ("Threats of deportation . . . do not state a claim for involuntary servitude.  So long as 'the servant knows he has a choice

between continued service and freedom,' he is not working involuntarily 'even if the master has

led him to believe that the choice may entail consequences that are exceedingly bad.'") (quoting

*United States v. Shackney*, 333 F.3d 475, 486 (2d Cir. 1964)).  And, in any event, while Plaintiff

"argues that [s]he was subject to legal coercion, nothing can escape the fact that [s]he no longer

works at [Maryknoll], and [s]he is not being forced to work there."  *Ramirez-De Leon v. Mujica-*

*Cotto*, 345 F. Supp. 2d 174, 193 (D.P.R. 2004).  Indeed, Plaintiff does not dispute that she

elected to depart Maryknoll once it became clear that Defendant was unwilling to provide her

with a mission assignment other than Panama, and that she was released from her vows and her

employment shortly thereafter.  (*See* P's Depo. 2 at 464:23-465:25, 486:24-488:10; D's 56.1

Stmt. ¶¶ 110, 118, 125-32.)  Because Plaintiff's own testimony and other undisputed facts

demonstrate her awareness that "[s]he ha[d] a choice between continued service and freedom,

[s]he [was] not working involuntarily."  *Winthal*, 1978 WL 14035, at *3.

Put simply, although "[P]laintiff[] ha[s] presented evidence of some difficult working

conditions," she "ha[s] demonstrated nothing akin to . . . slavery or any modern analogue" and

"[a]ny such comparison is plainly frivolous."  *Zavala*, 691 F.3d at 540.  Accordingly, Plaintiff's

§ 1583 enticement into slavery claim fails as a matter of law and must be dismissed.

### C.   <u>Abandoned Claim</u>

Plaintiff's Complaint also raises a document servitude claim pursuant to 18 U.S.C. §

1592.[13]  "A defendant is liable for Document Servitude when he or she 'knowingly destroys,

conceals, removes, confiscates, or possesses any actual or purported passport or other

immigration document . . . of another person' in the course of another violation of the TVPRA."

---

[13] Plaintiff's Complaint erroneously identifies the TVPRA section addressing document servitude claims as 18 U.S.C. § 1599, but the correct section is § 1592.  (*See* Compl. at 9.)

*Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, No. 19-CV-1422, 2021 WL 7186030, at *10

(E.D.N.Y. Apr. 30, 2021) (quoting 18 U.S.C. § 1592).  Defendant moved for summary judgment

on Plaintiff's document servitude claim, (*see* ECF No. 55 at 22-24), but Plaintiff's Opposition

was silent as to that claim, (*see generally* P's Opp.).  Because Plaintiff failed to respond or even

mention the document servitude claim in her Opposition to Defendant's summary judgment

motion, that claim is dismissed as abandoned.[14]  *Gaston v. City of N.Y.*, 851 F. Supp. 2d 780, 796

---

[14] Even if the Court were to consider the merits of Plaintiff's document servitude claim, it would fail as a matter of law.  In her Complaint, Plaintiff contends that Defendant "knowingly confiscated [her] passport as well as all other identifying documentation" and that this "was done to further prevent [her] escape and restrict her movement," *i.e.*, to "prevent [her] from traveling back to Tanzania or anywhere else without their permission and control."  (Compl.¶¶ 72-73, 76.)

But courts have uniformly rejected similar allegations where, as here, plaintiffs in fact had access to their passports and identifying documentation.  *See, e.g.*, *Muchira*, 850 F.3d at 623-24; *Akhtar*, 2021 WL 7186030, at *10.  Those Courts correctly interpreted 18 U.S.C. § 1592 and properly applied relevant precedent –  in particular the Fourth Circuit in *Muchira* – and I would dismiss Plaintiff's document servitude claim for substantially the same reasons as stated in that opinion, (*see Muchira*, 850 F.3d at 623-24), given that Plaintiff does not dispute that she had regular access to her passport whenever she requested it, retained possession of her passport at times, and used her passport to travel both domestically and abroad – far greater access to her passport than the plaintiff in *Muchira* had.  (*See* D's 56.1 Stmt. ¶¶ 38-39, 44, 79, 95, 99-100; P's Depo. 2 at 337:6-20 (Plaintiff held onto her passport when she returned from Panama and had her passport when she traveled to Minnesota for her vacation visiting Enneking)); *see also Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1076-77 (E.D. Wa. 2013) (denying summary judgment on § 1592 claim where "[p]laintiffs . . . introduced evidence that they repeatedly asked to have their passports returned, and . . . despite those requests the passports were not returned for some time, including for approximately two years in the case of [one] [p]laintiff"); *Dlamini v. Babb*, No. 13-CV-2699, 2014 WL 5761118, at *3-4 (N.D. Ga. Nov. 5, 2014) (holding that defendants were liable for document servitude where they "instructed [p]laintiff to surrender her passport and return ticket"; told plaintiff she "was not to leave [d]efendants' residence"; and "refused to return Plaintiff's passport or her return ticket to Swaziland").

Moreover, § 1592 requires that the document confiscation occur in the context of "a violation, or intent to violate, the underlying forced-labor statutory provision[s]" of the TVPRA and therefore Plaintiff's document servitude claim fails for the independent reason that she has not sufficiently supported her claims that Defendant forced her into labor, enticed her into slavery, or intended to do so.  *Mallela v. Cogent Infotech Corp.*, No. 19-CV-1658, 2020 WL 2541860, at *6 (W.D. Pa. May 19, 2020); *see Muchira v. Al-Rawaf*, No. 14-CV-770, 2015 WL 1787144, at *8 (E.D. Va. Apr. 15, 2015) ("Having concluded that there is insufficient evidence

(S.D.N.Y. 2012); *see Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case

of a counseled party, a court may, when appropriate, infer from a party's partial opposition that

relevant claims or defenses that are not defended have been abandoned."); *Jizi Cui v. Fed.*

*Bureau of Investigation*, 551 F. Supp. 3d 4, 16 (E.D.N.Y. 2011) (collecting cases).[15]

IV.   **CONCLUSION**

For the foregoing reasons, the Defendant's motion is GRANTED.  The Clerk of the Court

is respectfully directed to terminate the pending motion, (ECF No. 48), enter judgment for

Defendant, and close the case.


**SO ORDERED.**

Dated: March 14, 2023
       White Plains, New York

_____

       CATHY SEIBEL, U.S.D.J.

---

in the record to support Plaintiff's claims that Defendants violated Sections 1584 or 1589, or any
other predicate offense . . . Plaintiff's remaining [§ 1592] claim[] . . . must necessarily be
dismissed."), *aff'd*, 850 F.3d 605 (4th Cir. 2017); *United States v. Alstatt*, 858 F. Supp. 2d 1032,
1046-47 (D. Neb. 2012) (defendants not guilty of document servitude even where they "did in
fact take and conceal . . . passports and other immigration documents" because the government
could not "prove[] the defendants intended to commit peonage without evidence that the subject
immigrants were forced or coerced to work for the defendants.").

[15] Because all of Plaintiff's TVPRA "claims fail as a matter of law, . . . the Court need
not and does not reach Defendant['s] other argument[] for dismissal of those claims, [namely]
the ministerial exception." *Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, No. 20-CV-
3809, 2023 WL 2185827, at *6 (S.D.N.Y. Feb. 23, 2023); *see Headley*, 687 F.3d at 1181
("[B]ecause [plaintiffs] have not established a genuine issue of material fact regarding whether
the defendants obtained their labor by means of improper conduct, we need not reach the
question of whether the ministerial exception would bar a claim under the [TVPRA].").